**UNITED STATES of America**

v.

**Javier FONSECA–RAMOS.**

**Crim. No. 3–89–224–H.**

United States District Court,
N.D. Texas,
Dallas Division.

Oct. 10, 1989.

Rose Romero, Asst. U.S. Atty., Dallas, Tex., for U.S.

Gilbert Medina, Carrollton, Tex., for defendant.

## MEMORANDUM OPINION
## AND ORDER

SANDERS, Chief Judge.

Before the Court is Defendant Fonseca–Ramos' Motion to Suppress, filed September 5, 1989, the Government's response, filed September 15, 1989, and the transcript of the hearing held on this matter on September 28, 1989.

## BACKGROUND

The Defendant was indicted for transporting illegal aliens. Much, if not all, of the evidence against him was obtained following a stop of the Defendant's car on Interstate 35 near Waxahachie, Texas by a uniformed Border Patrol agent. Arguing that the stop was illegal because the agent lacked the requisite reasonable suspicion, the Defendant asked the Court to suppress all evidence obtained during and pursuant to this stop.

The Court heard testimony on the issue, and issued a ruling from the bench. Having read the transcript, the Court files this Memorandum Opinion and Order SUPERSEDING the oral ruling. While the conclusion remains the same, the Court wishes to elucidate further the reasoning supporting its decision.

## FACTS

On July 7, 1989, INS Senior Border Patrol Agent Stephen C. Hunt was sitting in his marked Border Patrol car in the median strip of Interstate 35 near Waxahachie, Texas, facing south. I–35 is a major thoroughfare, carrying thousands of vehicles and passengers each day. It runs from the Mexican border through Laredo, Alice, San Antonio, Austin, Waco, Waxahachie, and Dallas/Ft. Worth. The highway has three lanes running in each direction where Agent Hunt was located.

Agent Hunt has been with the INS for twelve years, ten of them in San Diego, and two of them in Dallas. Tr. 4–6. Agent Hunt was on highway intercept duty that day, being placed in that location because I–35, in his own words, "is a major thoroughfare.... It is what we consider a funnel point to the north." Tr. 10. The agent had worked there previously, making approximately six or seven stops of illegal aliens. Tr. 11. From his experience speaking with illegal aliens who had been apprehended, he believed I–35 to be one of the most frequent routes of travel for illegal aliens. Tr. 12.

At some point during the day, Agent Hunt saw a 1978 Cordova, which he classified as a large sedan capable of carrying six passengers and lots of packages. Tr. 13. The agent noticed that car was full of passengers. Tr. 16. Although there was nothing unusual about the appearance of the driver (whom the agent identified in the courtroom as the Defendant), the agent testified that as the Defendant drove past the agent's car, the Defendant "looked shocked." Tr. 15. In the agent's experience, that behavior is different from the general public which usually either slows down, waves, or honks. Tr. 15.

Having decided to take a closer look, Agent Hunt pulled out onto I–35 and caught up with the Cordova. He drove alongside for about one mile. He noticed that the occupants were young Hispanic males, were not paying any attention to him, appeared to be "rigid," and that the two passengers furthest from him in the back seat appeared to slouch down, as if trying to hide. Tr. 17. After driving parallel to the Cordova for a mile, Agent Hunt pulled the car over.

## ANALYSIS

The leading U.S. Supreme Court case on stops of cars by Border Patrol agents searching for illegal aliens in areas distant from the border is *U.S. v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). The standard set out by the Supreme Court is that:

> officers on roving patrols may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country.

*Id.* at 884, 95 S.Ct. at 2581. The factors that may be considered in developing that reasonable suspicion are:

1. characteristics of the area;
2. proximity to the border;
3. usual pattern of traffic on the particular road;
4. previous experience with alien traffic;
5. information about recent illegal border crossings;
6. driver's behavior such as erratic driving or obvious attempts to evade officers;
7. aspects of the vehicle such as:
   a. knowledge of officers about use of certain large vehicles that frequently are used for transporting concealed aliens;
   b. heavily loaded;
   c. extraordinary number of passengers;
   d. persons trying to hide;
8. recognition of characteristic appearance of Mexicans, such as mode of dress and haircut.

*Id.* at 884–85, 95 S.Ct. at 2581–82.

Importantly, an "officer is entitled to assess the facts in light of his experiences in detecting illegal entry and smuggling," and each situation must be evaluated on a case-by-case analysis. *Id.* at 885 & n. 10, 95 S.Ct. at 2582 & n. 10.

While under the *Brignoni–Ponce* list of acceptable factors, Agent Hunt could have had a reasonable suspicion, the Fifth Circuit has interpreted this standard restrictively. In the early 1980's, the Circuit decided that the primary consideration must be whether the INS has reason to believe that the car had recently come from the border. If no such evidence exists, then the Circuit looks "charily" upon the other factors. *See United States v. Pena–Cantu,* 639 F.2d 1228, 1229 (5th Cir.1981); *U.S. v. Ortega–Serrano,* 788 F.2d 299, 301 (5th Cir.1986).

Having so guided the district courts, the Fifth Circuit has considered various situations, rarely finding reasonable suspicion when the car is stopped far from the border. Nowhere does the Circuit mandate a minimum number of factors to meet the standard, although the Circuit has said that the simple fact that the passengers look Mexican is not enough. *Ortega–Serrano,* at 301. Therefore, this Court must weigh the evidence in light of the Fifth Circuit's rulings to determine whether Agent Hunt had sufficient cause to stop the Defendant.

### FACTORS

At oral argument, the Government listed each factor which it felt supported Agent Hunt's reasonable suspicion. The Court will reiterate those factors here, and discuss each one in turn.

1. I–35 is known as a "funnel" for alien smuggling. T. 40.

While I–35 may frequently be used by alien smugglers, it is used far more frequently by other travellers. As this Court interprets this factor, the Fifth Circuit intends to accept such evidence only if a high percentage of the travellers in a particular area are involved in alien-smuggling. In contrast, while many alien smugglers may use I–35, no testimony was offered to show that such smugglers constitute a large or even a significant percentage of the traffic on the road.

Accepting the agent's statement that I–35 near Waxahachie is known as an alien-smuggling area as a valid factor would open up the entire interstate freeway system for potential border patrol searches,[1] seriously undermining the effort to protect the constitutional right of citizens to be free of unreasonable searches that lies behind the Fifth Circuit's test. Therefore, I–35 cannot be viewed as an area known to be used for alien smuggling in the sense required under Fifth Circuit precedents. *See United States v. Pacheco,* 617 F.2d 84, 86 (5th Cir.1980) (that I–35 between Laredo and Dilley runs through seven (smaller) towns and is intersected by 11 roads is proof that "it was pure speculation on the part of the agents to opine that appellant's journey originated at the border").

---

1. The Court notes that Agent Hunt testified that the INS also considers I–20, another major interstate that traverses all of Texas, as a major alien-smuggling route. Tr. 24.

2. The type of vehicle the Defendant was driving is commonly used to transport illegal aliens in the agent's experience. Tr. 40.

As Defendant correctly pointed out, such a car is designed to carry a large number of passengers, and in many of the alien stop cases, the INS has claimed that the type of car driven by the defendant is a type frequently used to smuggle aliens. *See, e.g., United States v. Lamas,* 608 F.2d 547 (5th Cir.1979) (Ford); *Ortega–Serrano,* at 301 (Camaro); *Brignoni–Ponce,* at 885 (station wagons); Tr. 35–36 (Agent Hunt's list includes Cordovas, Diplomats, Monte Carlos, LTDs). Additionally, nothing distinguished this particular car from other large sedans. Tr. 34–35 (no tinted windows, cheap paint job, or heavy shocks). Thus, the Court can place little reliance on this factor.

3. The vehicle appeared to be heavily-laden. Tr. 40.

The agent could not say that the vehicle looked more heavily-laden than a car carrying six passengers should. This factor is entitled to no weight.

4. The car was carrying an unusually large number of passengers. Tr. 40–41.

Precisely what the Fifth Circuit means by an "unusually large number of passengers" is unclear, but logically, the Circuit must be requiring that the car be carrying more passengers than it was designed to hold comfortably. Since the agent admitted that a Cordova was designed by Detroit to carry a large number of passengers, the Court cannot find that having six passengers in such a car is a reasonable ground for suspicion.

5. Two of those passengers appeared to the agent to be attempting to hide. Tr. 41.

This is a valid factor.

6. All of the passengers were young Hispanic males. Tr. 41.

While not sufficient alone, the apparent Hispanic ancestry of the passengers is an allowable factor.[2]

2. The Court acknowledges that its statement to the contrary at the oral hearing is incorrect, *see*

7. The agent did not immediately pull the car over, but drove alongside for one mile, continuing to observe the occupants. Tr. 41.

This fact may actually cut against the Government, as it did in *Pena–Cantu,* at 1230. There, the Fifth Circuit deemed the continued observance of a car by an agent as evidence of the lack of a reasonable suspicion on the part of the agent.

8. The driver was visibly shocked when he saw a marked Border Patrol car in the median. Tr. 41.

As Defendant pointed out, the fact that a driver is shocked to see what resembles a police car in the median is not entitled to great weight, since at first glance, a Border Patrol car sitting in a median strip resembles a highway patrol car setting a speed trap. See Tr. 25–26. However, the reaction of the driver does bolster slightly the Government's case.

9. The other passengers were rigid and nervous and refused to look at the officer as he drove alongside. Tr. 42.

According to *Pacheco,* the fact that the passengers avoided eye contact with the officers is entitled to no weight whatsoever. " 'Reasonable suspicion should not turn on ophthalmological reactions of the appellant.' " *Pacheco,* at 87, *citing United States v. Lopez,* 564 F.2d 710, 712 (5th Cir.1977). *See also Ortega–Serrano,* at 302.

10. The officer has had twelve years of experience with the INS, including two years here in Dallas. Tr. 42.

This is relevant.

In opposition to these factors are the following two facts:

First and most telling, the stop occurred over 400 miles from the Mexican border, and there was no indication that this particular car came from the border. Tr. 43. The Fifth Circuit has repeatedly admonished the District Courts to discount the other factors in light of this fact.

Tr. 47–48, and it is hereby superseded.

Second, the agent testified that he had no special intelligence or other reports that alien smuggling would be occurring on that day or in that area. Tr. 28.

Boiling all this information down, the Court concludes that the extent of the circumstances supporting Agent Hunt's reasonable suspicion is that the driver of a car with five young Hispanic male passengers looked shocked when he passed a Border Patrol car on a major thoroughfare. Pulling up to the driver, the agent noticed that two of the passengers appeared to be trying to hide. Counterbalancing this evidence is the fact that the car was over 400 miles from the border, the agent had no reason to suspect that the car was coming from the border, and he had no reports that any alien smuggling was likely to occur in that area.

Weighing these factors in light of the restrictive Fifth Circuit precedents, *see, e.g., Pena–Cantu*, at 1229 (facts that travellers were proceeding north, were adult Hispanic males, back seat passengers were sitting low as if to avoid detection, occupants did not look like tourists, and cars were of a type often used by smugglers insufficient to support a reasonable suspicion); *Pacheco*, at 86–87 (even though car was only 85 miles away from border on route known to INS to be used for smuggling, fact that car was on I–35 destroys any presumption that it came from the border; therefore, facts that car appeared heavily loaded, and rear seat passengers "hunkered down" and avoided eye contact insufficient); *Ortega–Serrano*, at 300–02 (odd characteristics of car, Hispanic appearance of passengers, and nervousness of rear seat passengers insufficient to support stop on I–35 south of Dallas/Ft. Worth), the Court finds that Agent Hunt did not have a reasonable suspicion to stop the Defendant's car.

Accordingly, the Defendant's Motion to Suppress is GRANTED.

SO ORDERED.