UNITED STATES of America,
Plaintiff-Appellee,

v.

Jose Maria PENA–CANTU,
Defendant-Appellant.

No. 80–1283.

United States Court of Appeals,
Fifth Circuit.
Unit A

March 16, 1981.

H. Lon Harper, Court-appointed, Houston, Tex., for defendant-appellant.

J. A. Canales, U. S. Atty., George A. Kelt, Michol O'Connor, James R. Gough, Asst. U. S. Attys., Houston, Tex., for plaintiff-appellee.

Before BROWN, THORNBERRY and WILLIAMS, Circuit Judges.

THORNBERRY, Circuit Judge:

On December 5, 1979, agents of the Immigration and Naturalization Services (I.N.S.) spotted two cars proceeding northeast together on U.S. Highway 59 some twenty miles southwest of Houston, Texas. Because all of the numerous occupants of both vehicles were adult males of Hispanic appearance travelling during working hours without the accouterments of tourists, the agents suspected that they were illegal

aliens. Four agents in two unmarked vehicles followed appellant and his passengers until they arrived at a Houston residence. The agents parked directly behind appellant's vehicle, identified themselves as I.N.S. agents, and questioned the occupants concerning their citizenship. In response to the agents' inquiries, the passengers admitted that they had entered the country illegally.

Appellant moved to suppress his passengers' statements on the ground that the agents acquired the evidence pursuant to an illegal seizure. The district court denied the motion to suppress after a full evidentiary hearing and then, pursuant to stipulated facts, found appellant guilty of transporting illegal aliens in violation of 8 U.S.C. § 1324(a)(2). For the reasons stated below, we reverse the district court's denial of appellant's motion to suppress.

A. *Seizure*

 A seizure of a person, within the meaning of the Fourth Amendment, occurs when an officer of the law takes actions that would induce a reasonable person to believe that he would not be free to leave. *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *United States v. Pulvano*, 629 F.2d 1151 (5th Cir. 1980); *United States v. Robinson*, 625 F.2d 1211 (5th Cir. 1980); *United States v. Elmore*, 595 F.2d 1036 (5th Cir. 1979). *See also Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

 Applying this objective standard to the facts of this case, we conclude that a reasonable driver would not feel free to ignore a situation in which several agents pull up directly behind his stationary car, position themselves on both the driver and passenger sides of the vehicle, and proceed to question him while he and his passengers remain within the confines of the car. Since the agents clearly manifested an intention to cabin appellant within his car until he identified himself, an investigatory seizure occurred before the agents discover-

ed the illegal status of his compatriots. *See United States v. Bowles*, 625 F.2d 526 (5th Cir. 1980); *United States v. Robinson*, 535 F.2d 881 (5th Cir. 1976.)

B. *Reasonable Suspicion*

 The Fourth Amendment permits roving border patrols to "seize" travellers for the limited purpose of investigating their citizenship *if* the agent is "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *United States v. Brignoni-Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975).

 Several recent decisions of this Court have established that a key parameter in the suspicion calculus is reason to believe that the vehicle in question has recently crossed the border. *See, e. g., United States v. Pacheco*, 617 F.2d 84 (5th Cir. 1980); *United States v. Lamas*, 608 F.2d 547 (5th Cir. 1979); *United States v. Ballard*, 600 F.2d 1115 (5th Cir. 1979); *United States v. Escamilla*, 560 F.2d 1229 (5th Cir. 1977). Since the agents in this instance did not testify that they had reason to believe that the vehicles had crossed the border, and since such belief certainly cannot be presumed where the cars were first spotted over 250 miles from the nearest border crossing, we are required to examine charily the remaining facts marshalled by the government to support the agents' suspicions. *See United States v. Lopez*, 564 F.2d 710 (5th Cir. 1977).

 Essentially, the following facts sparked the agents' interest in appellant's vehicle: (1) the travellers were proceeding in a northerly direction away from Mexico toward Houston; (2) the occupants of both cars were adult males of Hispanic appearance; (3) the passengers in the back seat were sitting low as if to avoid detection; (4) the occupants did not look like tourists; (5) the cars were of the type often used by smugglers.[1] These facts are, however, un-

---

1. Although the government articulates other facts here on appeal, we decline to consider

those for which there is no support in the record. For example, the government relies on

questionably insufficient to justify an investigatory seizure. *See United States v. Lamas, supra; United States v. Escamilla, supra.* This conclusion is fortified by one of the agent's own testimony. Agent James K. Storey testified that he and his colleagues decided to follow these vehicles to their destination rather than stop them on the spot because they did not believe that they had sufficient information to warrant a stop. Trial Transcript at 55, 70. Since there is nothing in the record to indicate that the agents acquired any more articulable basis for their suspicion by the time they finally approached appellant's vehicle, we can only agree with Agent Storey and conclude that the suspicion in this instance fell below that threshold necessary to warrant an investigatory seizure.

The judgment of the district court is accordingly REVERSED, and the case is REMANDED for entry of an order granting appellant's motion to suppress and for further proceedings consistent with this opinion.

JOHN R. BROWN, Circuit Judge, dissenting:

Because I believe that the Court's opinion today not only is wrong but also establishes unfortunate precedent, I am forced to register a sharp dissent. Although I am not entirely convinced that there was a seizure in this case or that the agents acted without

reasonable suspicion, these are not the parts of the Court's opinion which disturb me. Rather, I am concerned by the sweeping effect of the Court's conclusion that Pena-Cantu's motion to suppress should have been granted; a conclusion which essentially cloaks a defendant in a case such as this with immunity from future prosecution.

This case warrants closer examination than that afforded by the Court's opinion. The Court states that at the time the agents initially questioned the driver (defendant) and the passengers in Pena-Cantu's car, the passengers admitted to the agents that they had entered the United States illegally. The Court goes on to state: "Appellant moved to suppress his passengers' statements on the ground that the agents acquired the evidence pursuant to an illegal search."

The Court's statement of the case falls short. Even a cursory examination of the record reveals that these initial statements by the passengers played absolutely no role in the conviction of Pena-Cantu. Rather, the conviction was based entirely on the District Court's consideration of a signed stipulation by Pena-Cantu [1] which essentially provides that if a named passenger were placed on the stand as a witness that he would testify against Pena-Cantu as to each of the elements of the charge of transporting illegal aliens.[2] Since this signed stipula-

---

the high rate of speed of the vehicles despite Agent Storey's testimony that he found nothing unusual in the rate of speed or driving patterns. Trial Transcript at 59. Furthermore, the government asserts as an important factor underpinning the agents' suspicion that "the cars were followed to an area of Houston which is known to contain 'drop' houses for illegal aliens." Although Agent Murphy testified that "our primary purpose was to observe if these vehicles were going to one of those [drop house] locations," Trial Transcript at 29, there is absolutely no testimony suggesting that appellant actually arrived at such a residence.

1. The District Court's entire discussion in the record concerning the guilt or innocence of Pena-Cantu is one sentence long:

[A]s to the defendant Jose Maria Pena-Cantu after taking into consideration the stipulations introduced into evidence, I find that

defendant guilty of count number eight [the sole count against Pena-Cantu]. (T.78).

2. The signed stipulation of Pena-Cantu introduced into evidence reads as follows:

Subject to the Court's ruling on the Defendant's Motion to Suppress Evidence, the Defendant, JOSE MARIA PENA–CANTU, agrees and stipulates with the Government that if the witness Luis Marte-Minaya were called to testify in the trial of this case he would testify as follows:

(1) That the witness Luis Marte-Minaya is a resident citizen of the Dominican Republic;

(2) That on or about the 4th day of December, 1979, the said Luis Marte-Minaya entered the United States illegally through the Republic of Mexico; in that he was not duly admitted by an Immigra-

tion alone was more than sufficient to convict Pena-Cantu, it is obvious that this stipulation, rather than the initial statements by the passengers to the agents, was the true target of the motion to suppress.[3]

Actually, the Court's opinion confuses *what* and *whose* constitutional rights were violated and *who* can assert what rights. Even assuming that the constitutional rights of the alien passengers were somehow violated, Pena-Cantu has no standing to, and may not, complain that he was harmed by violation of *their* rights.

Even more important, the Government in its case did not use any statements made by the aliens at the time of the seizure by the agents. What and all that the agents obtained was evidence of identity and origin. Actually the agents during the time they were tailing the car saw both the driver and the occupants. Surely no Court would ever hold that an experienced immigration officer is violating anyone's constitutional rights by a continuous close high speed surveillance that revealed the appearance and physical identification of the occupants.

What the constitution protects is the right not to have statements made by the declarant during the unconstitutional restraint used against the declarant. It does not protect that person against the disclosure or use of information obtained by observation by the officers. So far as Pena-Cantu was concerned the only information elicited turned out to be false. He gave the wrong name and subsequent police work established his true name and address. None of this was learned by what anyone—either Pena-Cantu or the aliens—said during the seizure. But the Court's decision forever seals the lips of those in attendance.

The scope of Pena-Cantu's motion to suppress which this Court today, without qualification, orders must be granted on remand is exceedingly broad, covering "any and all evidence gained or obtained from [the impermissible] actions [of the Government]." The effect of the Court's order is to forever bar the use of the signed stipulation, or indeed the live testimony of one or more of the alien passengers in a subsequent trial of Pena-Cantu. The Court's opinion is disturbing not only because, for all practical purposes, it provides Pena-Cantu with immunity from future prosecution. Even more so, the Court orders this result without first making any independent examination of the signed stipulation itself or the facts underlying its origin.

There is no evidence that the stipulation was obtained by any coercion or overreaching on the part of Government authorities. Indeed, attached to the signed stipulation and executed the same day are two other documents approved by the District Court, one in English and an identical one in Spanish, signed by Pena-Cantu acknowledging that he understood his right to require the temporary detention in the United States of any illegal alien who was with him at this incident to testify either on his or the Government's behalf, and that he waived that right.[4]

tion officer and he was not lawfully entitled to enter or reside within the United States;

(3) That the said Luis Marte-Minaya was being transported in the United States and within the Southern District of Texas in a car driven by Jose Maria Pena-Cantu on the 5th day of December, 1979;

(4) That the said Jose Maria Pena-Cantu knew that Luis Marte-Minaya had entered this country illegally and was in this country illegally at the time that he was transporting him.

**3.** The stipulation itself was expressly made subject to the District Court's ruling on the motion to suppress. *See* n.2, supra.

**4.** The English language version of this signed document is as follows:

*ADVICE OF RIGHTS—RETENTION OF WITNESS*

You must understand that you have the right to require the temporary detention in the United States of any citizen of any foreign country who had no legal right to remain in the United States and who was with you at the time of your arrest. Each may be a witness at your trial.

1. If you do not request or desire these witnesses to stay, some of them may be returned to their country of origin. If they are returned to their country of origin, they cannot later be required to return to the United States to testify at your trial.

Barring any constitutional violation in the securing of the stipulation itself, I believe strongly that it could be suppressed only if the live testimony of the witness named in the stipulation would be subject to suppression. In light of the concern expressed by the Supreme Court in *United States v. Ceccolini*, 435 U.S. 268, 278, 98 S.Ct. 1054, 1061, 55 L.Ed.2d 268 (1978) as to the great cost of excluding live witnesses testimony, there can be no doubt that the live testimony of the witness in question would have been admitted in this case. Furthermore, I would hold that where a defendant with full awareness of his rights, as here, knowingly waives his right to temporarily detain an illegal alien witness for trial, thus placing the witness out of the reach of the Court and thereby precluding a meaningful *Ceccolini* inquiry, the defendant should be estopped from later claiming that the witness' prospective testimony, stipulated to by the defendant, is the "fruit of a poisoned tree."

The implicit holding [5] of the Court's decision today is that where a seizure is made without reasonable suspicion, any testimony (or a stipulated substitute) physically traceable to the original seizure must be suppressed. This holding is far too broad and is not mandated by the Fourth Amendment,

*Ceccolini*, or any considerations of fair play and substantial justice. At the *most* I would reverse the District Court's findings as to the legality of Pena-Cantu's arrest and order that the case be remanded for the sole purpose of inquiring into any possible constitutional violations surrounding Pena-Cantu's execution of the stipulation and waiver. By allowing Pena-Cantu to suppress the stipulation which he himself executed *after* all the material witnesses who could testify against him have been sent beyond the reach of the Court pursuant to his own waiver of detention, this Court, under dubious circumstances, has cloaked Pena-Cantu with immunity from future prosecution and created unfortunate precedent in the process. I therefore dissent.

2. If you want any of these potential witnesses to remain in the United States, they will remain under the supervision of the United States Government until the completion of all judicial proceedings are completed. This will be at no cost to you.

3. If they stay, this means these people will be present for your trial and could be called to testify by either the United States government or yourself. This does not necessarily mean they will testify either for you or against you. If these people are called to testify by the United States government, you, through your attorney, would have the right to question or cross-examine them.

4. You have the right to have a lawyer assist you at this time in making the decision to retain or to release these witnesses; if you cannot afford a lawyer, the United States will provide a lawyer to you at no cost.

5. You or your lawyer would have the right to question these witnesses before your trial.

WAIVER OF RIGHTS

I have read this statement and understand my rights. I understand that I have the right to

require the detention of those people who were with me at the time of my arrest. I agree that these people may be released at this time. I waive and give up my right to examine or cross examine these people in court at my trial. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me to agree to release these people.

5. Although the Court never expressly states that the stipulation must be suppressed by the District Court on remand, this is clearly the effect of the Court's order and it is reasonable to conclude that this was also the intent of the Court. Since the stipulation standing alone is unquestionably sufficient to convict, if the Court only intended to suppress the statements by the passengers then the Court would undoubtedly have affirmed the District Court. Any error concerning the admission of the statements *alone* would have been harmless beyond a reasonable doubt.