**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jose Angel ORTEGA–SERRANO,
Defendant-Appellant.**

**No. 85–1058.**

United States Court of Appeals,
Fifth Circuit.

April 28, 1986.

**300**

Gustavo E. Gonzales, Court-Appointed, Dallas, Tex., for defendant-appellant.

Terence Hart, Asst. U.S. Atty., Marvin Collins, James A. Rolfe, U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before GEE, RUBIN and GARZA, Circuit Judges.

GEE, Circuit Judge:

Jose Angel Ortega de Serrano ("Serrano") was charged with transporting illegal aliens in violation of 8 U.S.C. § 1324(a)(2) and pled guilty to that charge. The issue that Serrano presents on this appeal is whether the district court erred in holding that an Immigration and Naturalization Service ("INS") officer had reasonable suspicion to stop Serrano's car. We reverse.

**I.**

On September 9, 1984, agents with the antismuggling division of the INS in Dallas were positioned along I–35 south of Fort Worth and Dallas observing traffic. Agent Caplinger, an INS criminal investigation supervisor for three years, was parked on an I–35 overpass. During the course of his surveillance, Caplinger saw a northbound, early-model, bright red Chevrolet Camaro with at least four and possibly five Hispanic male occupants. Caplinger radioed to other INS agents located further north along I–35, advising them that a red Camaro with four or five occupants was going their way and instructing them to take a look at it. Agent Hankin, an INS criminal investigator for six years and a former border patrol agent for twelve years, was standing outside his unmarked vehicle alongside I–35 approximately one mile north of Caplinger when the Camaro drove by a minute or so later. Using binoculars, Hankin observed the Camaro travelling on the inside lane at the same speed as a group of other vehicles. Hankins' view was obstructed, however, by the cars between himself and the Camaro. After the Camaro passed, Hankin got into his vehicle for the purpose of pursuing the Camaro to get a better look. Several minutes later, Hankin caught up with the group of vehicles, but the Camaro was no longer with them. Hankin then proceeded north for ten to twelve miles at about 100 miles per hour for approximately eight of those miles before spotting the Camaro. When he reached the Camaro, he estimated that it was going about 70 miles per hour. Pulling up beside the Camaro, Hankin observed that the car was "pretty trashed out." Record, Vol. II at 26. It had a very uneven or home-made paint job, with everything but the tires and windows painted red. Hankin further observed that there were four young Hispanic males in the car. The driver was not wearing a shirt. The occupants in the back seat would not look at Hankin but appeared nervous and "like they had slept without combing their hair. They were kind of dirty looking." *Id.* After Hankin turned on his vehicle's siren and flashing red lights, the Camaro's driver slowed down, pulled over to the side of the interstate, and stopped. After identifying himself, Hankin asked to check the nationality of each occupant. Serrano, the driver, admitted that he was in the United States illegally.

Based on the September 9 incident, Serrano was indicted for knowingly transporting illegal aliens in violation of 8 U.S.C. § 1324(a)(2). Serrano moved to suppress all evidence obtained following his arrest, including the statements of his passengers and his own statements and admissions, claiming that the INS lacked reasonable suspicion to stop his car. After a hearing, the district court denied that motion, finding that there was reasonable suspicion. Serrano later pled guilty and was sentenced to five years probation. The issue that Serrano presents on this appeal is whether the district court erred in finding that the INS had reasonable suspicion to stop his car.

## II.

The starting point for our analysis of whether the INS had reasonable suspicion to stop Serrano is *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). In that case, the Supreme Court held that the fourth amendment prohibits INS roving patrols from stopping vehicles in areas near but not at the Mexican border or its functional equivalent and from questioning a vehicle's occupants as to citizenship absent a reasonable suspicion that the vehicle contains illegal aliens. *Id.* at 882, 95 S.Ct. at 2580. Such a reasonable suspicion must be supported by "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that the vehicle contains illegal aliens. *Id.* at 884, 95 S.Ct. at 2582. Factors that may properly be considered include (1) characteristics of the area where the vehicle is encountered, such as proximity to the border, usual traffic patterns, and previous experience with alien traffic; (2) information about recent illegal border crossings; (3) erratic or evasive driving; (4) characteristics of the

vehicle itself—whether it is among those types frequently used to transport aliens, whether it appears heavily loaded or has an unusually large number of passengers or its passengers are observed trying to hide; and (5), although not sufficient standing alone, the apparent Mexican ancestry of the occupants. *Id.* at 884–85, 887. The officer making the decision whether to stop is entitled to assess these factors in "light of his experience detecting illegal entry and smuggling." *Id.* at 885, 95 S.Ct. at 2582 (citation omitted). Whether the INS had a reasonable suspicion requires a case-by-case analysis turning on the totality of the particular circumstances. *Id.* at 884 n. 10, 95 S.Ct. at 2582 n. 10.

In applying *Brignoni-Ponce* to today's case, Hankin's testimony provides the only relevant evidence in determining whether there was a reasonable suspicion to stop Serrano. Hankin made the decision to stop Serrano. Caplinger's contribution was limited to the radio communication that a red Camaro with four or five occupants was proceeding north. Caplinger shared only an instruction presumably based on experience, not his reasoning.[1] And, with respect to Hankin's testimony, we are further obliged to examine it charily. This is because, as Hankin testified, there was no reason to believe that Serrano's vehicle—spotted some 300 to 400 miles north of the border—had recently come from the border. *United States v. Pena-Cantu,* 639 F.2d 1228, 1229 (5th Cir.1981).

Mindful of the restrictions on the evidence and the required level of scrutiny, the government provided only limited evidence to support a reasonable suspicion to stop Serrano's car. There was no testimony about the significance of the area for smuggling or Hankin's experience or suc-

---

1. Caplinger provided the only testimony on the significance of I–35 as a smuggling conduit to Dallas and Fort Worth; of Camaros in trafficking aliens; or of the fact that the driver was not wearing a shirt but the passengers were. Because Hankin alone made the decision to stop, the district court erred to the extent that it considered this evidence as supporting a reason-

able suspicion to stop Serrano. Counsel for the government must elicit from the agents who decide to make the stop those "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that the vehicle contains illegal aliens. *Brignoni-Ponce,* 422 U.S. at 884, 95 S.Ct. at 2582.

cess rate with stopping vehicles. All that we know is that Hankin had been with the Dallas office for four years and had fourteen additional years of experience with the INS. There was no testimony concerning information about illegal border crossings. Hankin did testify that Serrano tried to evade him, first by keeping a vehicle between the Camaro and Hankin when Hankin first observed the Camaro and then by rapidly accelerating once past Hankin. We attach little significance to this because Hankin's vehicle was not marked and he was not in uniform. With respect to the Camaro itself, there is no evidence that this type of car was frequently encountered in smuggling or that the car had somehow been modified for smuggling or that it had an unusual number of passengers. The sole engaging characteristics of the car were that it was an early model and had a "[v]ery uneven paint job all over it." Record, Vol. II at 27. The fact that the two passengers in the rear seat appeared nervous is not unusual. Hankin approached at a considerable rate of speed in his unmarked car, slowed down, and paralleled Serrano. No weight whatsoever attaches to the rear passengers' refusal to look at Hankin. *United States v. Pacheco,* 617 F.2d 84, 86 (5th Cir.1980). Hankin's remaining testimony was that he observed "four young males of Latin descent" in the Camaro, Record, Vol. II at 26; the driver was not wearing a shirt but the passengers were; and that "the people in the back looked like they hadn't—looked like they had slept without combing their hair. They were kind of dirty looking." Record, Vol. II at 27.

▮ Hankin's decision to stop Serrano, as reflected in his testimony, had to have been based on (1) an experienced partner's instruction to look closer; (2) his own experience—of which there is nothing in the record besides years of service; (3) an uneven paint job on an early-model car; (4) the fact that the occupants were Hispanics; and (5) the occupants' appearance. We have little doubt that Agent Hankin, an eighteen year veteran, knew what he was doing when he stopped Serrano. The

record, however, does next to nothing to convey the facts he relied on and the inferences he made on the basis of those facts. As the record has been presented to us and on the basis of prior cases where we have held the proof to be insufficient, *see, e.g., United States v. Pena-Cantu,* 639 F.2d 1228 (5th Cir.1981), *United States v. Pacheco,* 617 F.2d 84 (5th Cir.1980), *United States v. Lamas,* 608 F.2d 547 (5th Cir. 1979), we must disagree that Hankin had a reasonable suspicion to stop Serrano.

### III.

The district court order denying Serrano's motion to suppress is REVERSED. This cause is REMANDED for further proceedings consistent with this opinion.

GARZA, Circuit Judge, dissenting:

I respectfully dissent.

While I agree with the majority that the government provided only limited evidence to support reasonable suspicion to stop Serrano's car and that they probably could have done a better job, I still believe that the evidence was sufficient to create the necessary suspicion required for officer Hankin to stop the automobile in question.

To stop the great influx of aliens entering illegally into this country daily, we must not tie the hands of our immigration officers. We all realize that our border contains miles and miles of unmanned crossings. We took a giant step when we called our immigration checkpoints away from the border an equivalance to a border check. Another giant step to stem the flow of illegal aliens into this country was taken when the Supreme Court decided *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

We realize that the immigration officers involved in this case were many miles from the border, but they were there because many aliens evade detection closer to the border. My own interpretation of the evidence leads me to the conclusion that Officer Hankin had sufficient facts before him

to make him have the necessary suspicion to stop the Camaro in this case.

The majority attaches very little significance to officer Hankin's testimony that Serrano tried to evade him first by keeping a vehicle between himself and the side of I–35 and then by rapidly accelerating once past Hankin. They say they attach little significance because Hankin's vehicle was not marked and he was not in uniform. Serrano already had the opportunity to see officer Caplinger's car parked on the side of I–35. Smugglers know that INS officers do this. While officer Hankin's vehicle was not marked and he was not in uniform, he was parked on the side of I–35 and was using binoculars and probably Serrano saw this, and to me that's the reason that he accelerated and why officer Hankin had to drive at speeds of over 100 miles to catch up with him. If you give credence to this part of the testimony, and the court below did, and you give credence to the other facts found, even in the majority opinion, we cannot say that officer Hankin did not have the reasonable suspicion necessary to make the stop in this case.

I would affirm the court below on its denial of the motion to suppress.