REVISED June 21, 1999

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
_____

No. 97-50949
_____


UNITED STATES OF AMERICA,

                    Plaintiff-Appellee,

v.

SONIA LUZ LOPEZ-VALDEZ,

                    Defendant-Appellant.

_____

Appeal from the United States District Court for the
Western District of Texas
_____
June 1, 1999

Before EMILIO M. GARZA, BENAVIDES, and DENNIS, Circuit Judges.

BENAVIDES, Circuit Judge:

    Sonia Luz Lopez-Valdez ("Lopez") appeals from her criminal conviction for willfully transporting illegal aliens. Lopez contends that the district court erred in denying her motion to suppress certain evidence gathered after law enforcement officers stopped her car near the U.S.-Mexican border. This Court has jurisdiction pursuant to 28 U.S.C. § 1291. For the reasons set forth below, we REVERSE the district court's July 22, 1997 denial of Lopez's motion to suppress and remand for further proceedings consistent herewith.

## I.   BACKGROUND

    At about 8:30 a.m. on August 14, 1996, Appellant was driving east on Farm to Market Road (FM) 2644. FM 2644, which connects

FM 1021 to U.S. Highway 277, originates in El Indio, Texas, a small town near the U.S.-Mexican border.  FM 2644 is the main road from El Indio to the larger towns of Carrizo Springs and Crystal City.

Heading east, away from the border, Lopez's Buick passed the west-bound marked patrol unit of Texas Department of Public Safety ("DPS") trooper Charles Flori.  Flori's passenger, United States Border Patrol Agent Matthew Mizell,[1] noticed numerous passengers in the Buick.  Based on the number of people in the car and the fact that FM 2644 circumnavigates the Highway 277 checkpoint, Agent Mizell suspected that the vehicle could be engaged in alien smuggling.  Agent Mizell and Trooper Flori discussed these suspicions.  Trooper Flori decided to turn his patrol car around so that he and Agent Mizell could get a better look.

Before turning his patrol car around, Trooper Flori saw in his rearview mirror the Buick's brake lights come on.  Flori observed that the right taillight had a hole in its lens cover and that the taillight emitted both red and white light.[2]  Agent Mizell also saw that the Buick had a damaged taillight.  Later inspection revealed that an inch-long, rectangular-shaped piece of the taillight lens was missing.  The bulb was behind the intact part of the red lens.

---

[1]Agent Mizell had been assigned to ride with Flori as part of a joint investigatory effort by the U.S. Border Patrol and the Texas Department of Public Safety to detect narcotics trafficking and alien smuggling.

[2]Essentially, all the witnesses (both from the Government and the Defense) at trial conceded that the brake light emitted both a white and a red light.

Trooper Flori stopped the Buick because he believed that a broken taillight constituted a traffic infraction. Trooper Flori turned on his patrol car's flashing lights; the Buick stopped. As Flori talked with Lopez, Agent Mizell asked the passengers about their citizenship status. Most of the passengers did not have documents with them. They were arrested and read their Miranda rights. Lopez was also arrested and advised of her rights.

Lopez was transported to the border patrol station in Carrizo Springs, Texas, where she was processed and placed in a cell. Border Patrol Agent Eduardo Martinez removed Lopez from the cell to question her. Once in the interrogation room, he informed her, in English and Spanish, of her rights concerning remaining silent and receiving assistance of counsel. Lopez signed forms indicating that she understood her rights, and she answered the officer's questions. After the interrogation was finished, Lopez signed a typed statement of her answers. In the statement, Lopez admitted that she knew the people in her car were illegal aliens and that she was paid to drive them to Carrizo Springs.

Lopez was indicted on August 21, 1996, in the United States District Court for the Western District of Texas for two counts of willfully transporting illegal aliens. Before trial, she moved to suppress certain evidence, including her post-arrest statements and witness testimony, on the basis that it was the

fruit of an illegal detention.[3] Lopez waived her right to a jury trial. The district court carried the motion to suppress with the bench trial.

At the end of Lopez's trial, the district court heard arguments on the motion to suppress. Lopez, relying on State v. Vicknair, 751 SW.2d 180 (Tex.Crim.App. 1986, no pet.), asserted that it is well established law in Texas that a broken lens causing a taillight to emit both red and white light does not constitute an offense and as such could not serve as the basis for a traffic stop. Additionally, she contended that the facts known to the officers did not give rise to a reasonable suspicion that she was involved in illegal activity. The Government, on the other hand, argued that the totality of the circumstances justified the initial stop and that Flori's conduct amounted to a good-faith view of Texas traffic laws concerning broken taillights. The Government contended that this good-faith view would except from exclusion the evidence gathered subsequent to the stop.

The district court rightly decided that the suppression motion turned on the lawfulness of the vehicular stop. The court found that the taillight on Lopez's Buick emitted both white and red light. The court also found that officers Flori and Mizell

---

[3]At trial, the Government introduced Lopez's post-arrest statements as well as testimony by Jose Louis Perez Cordero and Roberto Manriquez, who had been passengers in Lopez's car. Both men testified that they had entered the United States illegally. They had arranged the entry with a woman, not Lopez, and had crossed the Rio Grande river guided by a man. After crossing, they waited until Lopez picked them up in her Buick.

-4-

did not manufacture the circumstances under which Flori effectuated the stop.  The court noted that, to the extent that Lopez's vehicle had been stopped for a traffic violation, Vicknair would require the motion to suppress to be granted because, in Texas, a damaged taillight which emits both red and white light could not justify a traffic stop.  The court did not attempt to carve out a good-faith exception to the exclusionary rule.  Instead the district court relied on the reasonable suspicion test that governs roving border patrol stops, and concluded that, given all the facts and circumstances in possession of both the federal agent and state trooper, there were sufficient articulable facts to raise a reasonable suspicion justifying the initial stop.

The district court denied the motion to suppress and found Lopez guilty as charged.  Lopez received five years' probation.

## II.  DISCUSSION

On appeal, Lopez argues that law enforcement officers lacked the reasonable suspicion necessary to justify an immigration stop of her vehicle; that a broken taillight did not provide probable cause for the police to effect a traffic stop; that a Texas DPS trooper's erroneous belief that a broken taillight constituted a traffic infraction did not excuse the vehicular search under the good-faith exception to the probable cause requirement; and that, in accordance with the Fourth Amendment prohibition against illegal searches and seizures, the illegal stop and detention of Lopez requires the suppression of all evidence acquired

-5-

subsequent to the stop.  The Government argues that the district court improperly concluded that the good-faith exception to the exclusionary rule was inapplicable and that either reasonable suspicion or the good-faith exception justified the vehicular stop.

A.

In reviewing the denial of a motion to suppress, a district court's purely factual findings are reviewed for clear error.  See United States v. Nichols, 142 F.3d 857, 864-65 (5th Cir. 1998).  Its conclusion that the facts provided the probable cause or reasonable suspicion necessary to justify a detention is reviewed de novo.  See Ornelas v. United States, 517 U.S. 690, 699 (1996).

B.

A vehicle may not be stopped simply because it is traveling on a road near the U.S.-Mexican border.  See Brown v. Texas, 443 U.S. 47, 49-52 (1979) (noting that presence in a high-crime area does not provide reasonble suspicion); United States v. Newell, 506 F.2d 401, 405 (5th Cir. 1975) (explaining that presence in a border area does not place a citizen "within a deconstitutionalized zone").  A border patrol agent may briefly detain a vehicle only if the agent is "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that the vehicle is involved in illegal activities.  United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975); see also United States v. Inocencio, 40

-6-

F.3d 716, 722 (5th Cir. 1994). In assessing the objective reasonableness of a stop, the reviewing court must consider the "whole picture." United States v. Cortez, 449 U.S. 411, 417-18 (1981). Several factors comprise that picture: (1) the area's proximity to the border, including evidence that the vehicle recently crossed the border; (2) the previous experience of the arresting agents with criminal activity; (3) known characteristics of the area; (4) the usual traffic patterns of that road; (5) information about recent illegal trafficking in aliens or narcotics in the area; (6) the behavior of the vehicle's driver; (7) the appearance of the vehicle; and (8) the number, appearance, and behavior of any passengers. See Brignoni-Ponce, 422 U.S. at 884. In applying the Brignoni-Ponce standard, this Court has recognized that the Supreme Court underpinned the standard with a balancing test; the public interest in addressing the continuing problems of alien and drug smuggling must be weighed against the private interest of an individual to be let alone in exercising his or her liberty. See Nichols, 142 F.3d at 861-62.

Although no single Brignoni-Ponce factor is controlling, see Inocencio, 40 F.3d at 722, we have considered physical proximity to the border to be a "vital element" in analyzing the totality of the circumstances. Nichols, 142 F.3d at 867 (citation omitted).[4] The Government relies on United States v.

---

[4]It is important to note that--although the Nichols Court did observe that Nichols' proximity to the border was an essential fact to consider, see 142 F.3d at 886-68--its conclusion that the stop was justified rested not on proximity

Cardona, 955 F.2d 976 (5th Cir. 1992) (finding that agents had a reasonable suspicion to conclude that the defendant's vehicle had originated at the border in light of the number of towns along the road, the number of intersecting roads, and the number of miles from the border), and argues that when, such as here, the stop occurs relatively close to the border (20 miles) and the road (FM 2644) comes directly from El Indio on the border--El Indio is the only town south of where Lopez's vehicle was stopped--it is reasonable to conclude that Lopez originated her journey at the border.

Even were we to agree with the Government and assume that Lopez originated her journey at the border, that factor "alone [is] not dispositive in the reasonable suspicion analysis." United States v. Pacheco, 617 F.2d 84, 86 (5th Cir. 1980); see also United States v. Diaz, 977 F.2d 163, 165 (5th Cir. 1992) (concluding that presence on the border is insufficient for a finding of reasonableness). Other Brignoni-Ponce factors must be considered. The Government identifies two additional facts that it contends justify the stop: the presence of numerous passengers in Lopez's car and the fact that the road on which Lopez was traveling could be used to circumvent an immigration checkpoint.

A review of Fifth Circuit authority, however, reveals that these facts are insufficient to justify the stop. First, in cases where the numerosity of passengers contributed to a finding

_____

alone, but on the totality of the circumstances reflected in the record. Id. at 859, 873.

-8-

of reasonable suspicion, we have consistently found the presence of additional factors indicative of wrongdoing. <u>See, e.g.</u>, <u>Brignoni-Ponce</u>, 422 U.S. at 885 (finding, as indicative of wrongdoing, passengers' attempts to hide); <u>United States v. Garcia</u>, 732 F.2d 1221, 1223 (5th Cir. 1984) (explaining that passengers' "unwashed" and "unkempt" appearance contributed toward a determination of reasonable suspicion); <u>United States v. Salazar-Martinez</u>, 710 F.2d 1087, 1089 (5th Cir. 1983) (noting the significance of passengers kneeling on floor with their heads down). Here, the record contains no evidence that the passengers engaged in evasive or unusual behavior. Additionally, the record contains no evidence that the passengers appeared unkempt or unwashed. Therefore, we find that the mere presence of several people in Lopez's Buick does not alone raise a reasonable suspicion; Fifth Circuit precedent requires that something more be shown.

Second, Lopez's presence on FM 2644 does not give rise to a reasonable inference of wrongdoing. Although there was testimony that FM 2644 could be used to avoid an immigration checkpoint, the Government did not introduce at trial any evidence that it was unusual to see a car on FM 2644 at 8:30 in the morning. The Appellant correctly notes, to the contrary, that the record showed that a resident of El Indio would take FM 2644 if she were heading to the larger towns of Carrizo Springs or Crystal City. Appellant additionally points out that in poorer areas, such as many communities along the U.S.-Mexican border, people are more

likely to share rides to work or to the larger towns and cities.

In sum, the facts seem to show only that Lopez was driving an older-model mid-size sedan with anywhere from six to eight visible passengers about 20 miles from the border.  We note that the Government failed to introduce at trial evidence of other Brignoni-Ponce factors.  In particular, the record before us contains no information about the border patrol agents' relevant experience, see, e.g., United States v. Ortega-Serrano, 788 F.2d 299, 302 (5th Cir. 1986) (reversing the denial of a motion to suppress and observing that the record contained no evidence of agent's relevant experience); no evidence of the usual traffic patterns on FM 2644; no evidence that there was anything unusual about the appearance or behavior of either Lopez or her passengers, see, e.g., Nichols, 142 F.3d at 866 (finding significant the fact that driver sat at the intersection for 30 seconds, then drove erratically as he watched a patrol vehicle in his rear view mirror); and no evidence that the Buick's appearance suggested smuggling, see, e.g., United States v. Chavez-Villarreal, 3 F.3d 124, 126 (5th Cir. 1993) (noting an agent's testimony that alien smugglers favored Suburbans); Ortega-Serrano, 788 F.2d at 302 (observing that no evidence was presented that a Camaro was the type of car frequently encountered in smuggling or that the car had somehow been modified for smuggling).

Because proximity to the border cannot alone justify a stop, a finding of reasonable suspicion in this case would have to be

-10-

based, in large part, upon the number of passengers in the car. As already discussed, however, Fifth Circuit precedent indicates that the mere presence of numerous people in a car does not raise a reasonable suspicion. Nor are we willing in the instant case to assign some magic number at which point reasonable suspicion would arise. Thus, absent a showing by the Government that other Brignoni-Ponce factors weigh in its favor, we hold that a mid-size sedan traveling on a road near the U.S.-Mexican border with as many as eight visible passengers does not give rise to reasonable suspicion of unlawful activity.

## C.

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996). This rule provides law enforcement officers broad leeway to conduct searches and seizures regardless of whether their subjective intent corresponds to the legal justification for their actions. See United States v. Miller, 146 F.3d 274, 279 (5th Cir. 1998). We have explained that the "flip-side of that leeway" is that "the legal justification must be objectively grounded." Id.; see also Goodwin v. Johnson, 132 F.3d 162, 173 (5th Cir. 1998) ("So long as a traffic law infraction that would have objectively justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment and

-11-

comparable Texas law.").  In <u>United States v. Miller</u>, 146 F.3d 274 (5th Cir. 1998), we held that where the supposed traffic infraction that formed the basis for a vehicular stop in fact was not a violation of state law, there was no objective basis for probable cause justifying the stop.  <u>See</u> <u>id.</u> at 279 (concluding that a driver operating a vehicle by flashing the left turn signal without turning or changing lanes did not violate Texas traffic law and thus that no probable cause existed to justify the traffic stop).

In this case, the Government argues that Trooper Flori stopped Appellant's Buick based upon his good-faith belief that the broken taillight constituted a violation of § 547.303 of the Texas Transportation Code.  Trooper Flori's belief, however, was incorrect.  In Texas, state police officers do not have authority to stop vehicles with cracked taillight lenses that "permit[] some white light to be emitted with red light."  <u>Vicknair v. State</u>, 751 S.W.2d at 187.[5]

Generally, the fruits of illegal searches and seizures are inadmissible under the exclusionary rule.  <u>See</u> <u>United States v.</u>

_____

[5]The statute at issue in Vicknair was former Texas Revised Civil Statute art. 6701d, § 111.  That statute provided in pertinent part that "every motor vehicle... shall be equipped with at least two (2) taillamps mounted on the rear, which when lighted as required in Section 109 [requiring lights on from  half an hour after sunset to half an hour before sunrise], shall emit a red light plainly visible from a distance of one thousand (1,000) feet to the rear [.]"  Tex. Rev.Civ.Stat. art. 6701d, § 111.  At the time that Lopez was stopped, 6701d, § 111 had been recodified as Texas Transportation Code § 547.322(d).

The Government on appeal argued that Trooper Flori stopped Lopez's vehicle based on his good-faith belief that the broken taillight constituted a violation of § 547.303, not § 547.322(d).  Whether Flori believed that Lopez was in violation of § 547.322(d) or § 547.303 is of no consequence.  The requirement embodied in § 547.303 existed at the time of <u>Vicknair</u>.  The former art. 6701d, § 115(b) simply distinguished rear lamp reflectors from the reflectors on other lamps that may be amber or white.

-12-

Ramirez-Lujan, 976 F.2d 930, 932 (5th Cir. 1992). But the good-faith exception to the exclusionary rule allows the admission of the fruits of some illegal stops. See id. Under this doctrine, we have held that "evidence is not to be suppressed . . . where it is discovered by officers in the course of actions that are taken in good-faith and in the reasonable, though mistaken, belief that they are authorized." United States v. De Leon-Reyna, 930 F.2d 396, 400 (5th Cir. 1991) (en banc).

Trooper Flori stopped Lopez in 1996. Ten years after Vicknair, no well-trained Texas police officer could reasonably believe that white light appearing with red light through a cracked red taillight lens constituted a violation of traffic law.[6]

Lopez rightly points out that this Court should be leery of extending the good-faith exception to this appeal. Under the general rule established in Whren, a traffic infraction can justify a stop even where the police officer made the stop for a reason other than the occurrence of the traffic infraction. See Goodwin v. Johnson, 132 F.3d 162, 173 (5th Cir. 1998). But if officers are allowed to stop vehicles based upon their subjective

---

[6]In a recent case, United States v. Nichols, 142 F.3d 857 (5th Cir. 1998), we noted that the "application of the good-faith exception to reasonable suspicion determinations has always involved circumstances extrinsic to the government agent's personal observations at the time of the stop." See id. at 860 n.1 (citations omitted). Here, Flori's actions were not based upon any circumstances extrinsic to his own personal observations. Flori stopped the Buick because he thought that the vehicle's broken taillight violated Texas law.

We need not and do not make a determination in the instant case based upon any extrinsic circumstance limitation. Rather we ground our analysis in the language of our en banc De Leon-Reyna decision which recognizes that an officer's course of action be taken not only in good faith but be objectively reasonable as well. See De Leon-Reyna, 930 F.2d at 400.

-13-

belief that traffic laws have been violated even where no such violation has, in fact, occurred, the potential for abuse of traffic infractions as pretext for effecting stops seems boundless and the costs to privacy rights excessive. Accordingly, we hold that Flori's actions do not pass muster under the good-faith exception to the exclusionary rule.

### III.  CONCLUSION

For the above reasons, we conclude that the district court erred in denying Appellant's motion to suppress her custodial statements as well as the statements of the two witnesses who were passengers in her car.  We therefore reverse and remand for further proceedings consistent herewith.

REVERSE and REMAND.

EMILIO M. GARZA, Circuit Judge, dissenting:

I agree with the majority opinion that the success of Lopez's motion to suppress evidence depends on whether the officers had reasonable suspicion to stop Lopez's vehicle. *See Reid v. Georgia*, 448 U.S. 438, 440, 100 S. Ct. 2752, 2754, 65 L. Ed. 2d 890 (1980) ("[A]ny curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity."). However, I disagree that the officers lacked reasonable suspicion to stop Lopez's vehicle. Accordingly, I dissent.

The district court denied Lopez's motion to suppress, finding that the officers had a reasonable suspicion that Lopez's vehicle was involved in criminal activity. When reviewing such a ruling, we review a district court's factual findings "under the clearly erroneous standard." *United States v. Inocencio*, 40 F.3d 716, 721 (5th Cir. 1994). "The conclusions of law derived from a district court's findings of fact, such as whether a reasonable suspicion existed to stop a vehicle, are reviewed *de novo*." *Id.*

The Supreme Court has made clear that "any number of factors may be taken into account in deciding whether there is reasonable suspicion to stop a car" near the border. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884, 95 S. Ct. 2574, 2582, 45 L. Ed. 2d 607 (1975). These factors include: (1) the characteristics of the area; (2) proximity to the border; (3) the usual traffic patterns on the particular road; (4) previous experience with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior; (7) aspects of the vehicle itself; (8) the vehicle's appearance; (9) whether the vehicle has an extraordinary number of passengers; (10) whether passengers are attempting to hide; and (11) the appearance of the driver and passengers. *See United States v. Jones*, 149 F.3d 364, 367 (5th Cir. 1998) (citing *Brignoni-Ponce*, 422 U.S. at 884-85, 95 S. Ct. at 2582). A court's inquiry into reasonable suspicion "is not limited to an analysis of any one factor." *Inocencio*, 40 F.3d at 722. "Rather, a finding of reasonable suspicion must be based on the 'totality of the circumstances known to the agent and

-15-

the agent's experience in evaluating such circumstances.'" *Jones*, 149 F.3d at 367 (quoting *United States v. Castaneda*, 951 F.2d 44, 47 (5th Cir. 1992)).

The totality of the circumstances known to Federal Agent Mizell gave rise to a reasonable suspicion that Lopez was involved in transporting illegal aliens. Mizell's testimony addressed several of the *Brignoni-Ponce* factors. Mizell testified that he stopped Lopez on FM 2644, twenty miles from the U.S.-Mexico border. FM 2644 comes directly from El Indio on the U.S.-Mexico border. FM 2644 was the only road circumventing the Highway 277 checkpoint. Moreover, the checkpoint on Highway 277 was operational at the time Lopez was stopped. The fact that a road circumvents an immigration checkpoint is relevant to establishing reasonable suspicion. *See, e.g.*, *United States v. Aldaco*, 168 F.3d 148, 152 (5th Cir. 1999); *Inocencio*, 40 F.3d at 723 (5th Cir. 1994); *United States v. Ramirez-Lujan*, 976 F.2d 930, 932, 934 (5th Cir. 1992). Finally, Mizell testified that there were "a lot of people" in Lopez's four-door Buick, and that the passengers were "piled in there." Such testimony shows that Mizell saw "an extraordinary number of passengers" in Lopez's car. *Jones*, 149 F.3d at 367. According to Mizell, the number of people in the car was "unusual."

These articulable facts created a reasonable suspicion that Lopez's vehicle was involved in transporting illegal aliens. Accordingly, the district court did not err in finding that the officers' stop of Lopez's vehicle was constitutionally permissible. I would uphold the district court's denial of Lopez's motion to suppress and affirm her conviction.