**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 22 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

SERGIO M. GOVEA SOLORIO,

Defendant - Appellant.

Nos. 02-7147 and 02-7150
(D.C. No. 02-CR-41-S)
(E.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **McKAY**, and **LUCERO**, Circuit Judges.

Defendant-Appellant Sergio Govea Solorio appeals from his conviction and

sentence for possession of methamphetamine with intent to distribute, 21 U.S.C.

§ 841(a), (b)(1)(A), upon a conditional plea of guilty. He was sentenced as a

career offender to 262 months imprisonment to be followed by five years of

supervised release. The issues on appeal are (1) whether Mr. Solorio's detention

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. This court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

during a traffic offense stop violated the Fourth Amendment, and (2) whether a prior conviction for vehicular manslaughter with gross negligence could be relied upon by the district court in sentencing Mr. Solorio. Our jurisdiction arises under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). We affirm.

Background

On the afternoon of March 5, 2002, Oklahoma Narcotics Task Force Agent Robert Rumble stopped Mr. Solorio for traveling 76 mph in a 70 mph zone on Interstate 40 in McIntosh County. II R. at 9-11. Mr. Solorio was the driver and only occupant of a Nissan Altima with California license plates.

At the officer's request, Mr. Solorio exited his vehicle and sat in the patrol car. At this point, the officer apparently said to Mr. Solorio that he was only going to give him a verbal warning. Id. at 31. The officer then asked for a driver's licence, and Mr. Solorio presented one from Mexico. Id. at 13. Mr. Solorio told the officer that he had lived in California for two years and the car belonged to his girlfriend. Id. at 15. He also produced the vehicle's registration and insurance documentation. The registration and insurance showed the owner of the vehicle to be Mojardin Rosa M. Jimenez. The insurance policy had been updated a month earlier and also showed that Mrs. Jimenez was married.

The officer contacted dispatch to determine if Mr. Solorio had a valid

United States driver's license and ran a radio check on whether the car was stolen. While awaiting an answer, the officer questioned Mr. Solorio about his travel agenda. Mr. Solorio told the officer that he had gone to Atlanta, Georgia, for two days to visit a cousin. The officer commented about it being a short stay for such a long trip, and Mr. Solorio replied that he was there for a week, not two days.

The dispatcher reported that Mr. Solorio did not have a valid driver's license for the United States. Id. at 17. The officer also learned that the car had not been reported stolen. Id. at 30. Mr. Solorio was informed that because he was living in the United States, he was required to have a United States driver's license. The officer told Mr. Solorio, however, that he was going to cut him "a break on the driver's license," and returned all of his documents, telling him that he was free to go. Id. at 17-18.

Officer Rumble then asked Mr. Solorio if he could ask him a question, to which Mr. Solorio responded, "Okay." Id. at 18. The officer asked if he was transporting illegal contraband, such as firearms or drugs. The defendant responded, "No, I'm not. Go look." Id. at 17. According to the officer, Mr. Solorio then became visibly nervous. The officer had Mr. Solorio sit in the patrol car while he searched the car, and Mr. Solorio could see the search of the vehicle. The officer instructed Mr. Solorio to honk the horn if he needed anything. Id. at

The officer testified that upon opening the passenger door of Mr. Solorio's vehicle, he noticed a strong odor of Bondo and fresh paint. Id. Bondo is a substance used by auto body shops to patch and fill metal. No body work appeared to have been done to the exterior of the car. Id. at 20. The officer also noticed that the bolts that held the seat to the floor were scratched as if they had been removed. Id. Through a slit or small tear in the carpet on the floor of the car, the officer could tell that the insulation had been glued to the floor itself. Id. Once the carpet and insulation were pulled loose, the officer saw the Bondo and smelled the odor of fabric softener.

The officer testified that based on his training and experience, he knew that Bondo and fabric softener are often used to mask the odor of illegal substances. Id. at 20-21. According to the officer, in over seventy cases that he has investigated involving false compartments used to smuggle drugs, the odor of fabric softeners, Bondo, and fresh paint were present. Id. at 21. The officer also testified that California, where Mr. Solorio claimed to be a resident, is a large source of illegal drugs, and Atlanta is a target city for drug distribution. Id. at 22. The officer indicated his suspicions were aroused also by the short duration of the stay in Atlanta, the discrepancy in the story, the fact that the car was registered to a married woman whom Solorio claimed was his girlfriend, Mr. Solorio's

nervousness, and the odor in the car.  Id. at 22-23.

The officer returned to his patrol car and asked Mr. Solorio about the modifications done to the vehicle.  Mr. Solorio stated that he did not understand English.  Id. at 23.  The officer testified that up until this point, he had no problems conversing with Mr. Solorio, and Mr. Solorio responded to questions in a contextually appropriate manner.  Id. at 13.

The car was then towed, and a drug sniffing dog alerted to inside the car.  Id. at 25.  The car was disassembled.  Concealed compartments revealed 5.9 pounds of methamphetamine and $50,497 in cash.  Id. at 27.

## Discussion

A.    Fourth Amendment

In reviewing the denial of a motion to suppress, we accept the district court's findings of fact unless they are clearly erroneous.  United States v. Lora-Solano, 330 F.3d 1288, 1292 (10th Cir. 2003).  We view the evidence in the light most favorable the district court's determination.  United States v. Sparks, 291 F.3d 683, 687 (10th Cir. 2002).  The ultimate question of whether Fourth Amendment rights have been violated is an issue of law reviewed de novo.  Lora-Solano, 330 F.3d at 1292.

A routine traffic stop is a seizure within the meaning of the Fourth

Amendment. United States v. Anderson, 114 F.3d 1059, 1063 (10th Cir. 1997). For purposes of constitutional analysis, however, it is characterized as an investigative detention and is therefore analyzed under the principles announced in Terry v. Ohio, 392 U.S. 1 (1968). Berkemer v. McCarty, 468 U.S. 420, 439 (1984); United States v. Caro, 248 F.3d 1240, 1244 (10th Cir. 2001).

Terry mandates a two-part inquiry. First, we determine whether the stop was justified at its inception. Id. at 20; United States v. Neff, 300 F.3d 1217, 1220 (10th Cir. 2002). This first part of the Terry inquiry is not a matter of dispute in this appeal. Mr. Solorio was stopped for speeding, and he does not challenge the reasonableness of the initial traffic stop. Aplt. Br. at 9; see United States v. Callarman, 273 F.3d 1284, 1286 (10th Cir. 2001) ("[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.") (quotation omitted).

Second, we determine whether the officer's actions during the detention were "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20; Neff, 300 F.3d at 1220. Mr. Solorio does challenge the reasonableness of the officer's detention of his car in order to perform a driver's license check.

An investigative detention must be temporary, lasting no longer than

necessary to effectuate the purpose of the stop, and the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. Florida v. Royer, 460 U.S. 491, 500 (1983); United States v. Wood, 106 F.3d 942, 945 (10th Cir. 1997). During a routine traffic stop a police officer may ask questions, request and examine a driver's license and vehicle documentation, and run such computer verifications as necessary to determine that the driver has a valid license and is entitled to operate the vehicle. Wood, 106 F.3d at 945. "The officer may detain the driver and his vehicle as long as reasonably necessary to make these determinations and to issue a citation or warning." Id. However, "[w]hen the driver has produced a valid license and proof of entitlement to operate the car, the driver must be allowed to proceed without further delay for additional questioning." United States v. Elliott, 107 F.3d 810, 813 (10th Cir. 1997).

On cross-examination, Officer Rumble said he was familiar with Okla. Stat. Ann. tit. 47, § 6-102, which provides that anyone over sixteen years of age who is properly licensed in his or her home country may operate a vehicle on Oklahoma roads. II R. at 28. The officer also said that he had been trained that a foreign license is valid only until the driver establishes residency in the United States, but he was unfamiliar with California law's residency requirements. Id. at 30. Moreover, he had no way to verify the Mexico license over the radio. Id. at 32-

Mr. Solorio argues that because he produced a valid driver's license that could not be verified and valid insurance and registration papers, the radio check was not related to the purposes of the stop and stretched beyond the appropriate scope. Mr. Solorio also argues that the purpose of the stop, to give a verbal warning, was completed at the beginning of the stop, once the warning was given. Thus, according to Mr. Solorio, any detention after the warning was for investigative purposes, which exceeded the scope of the stop. We disagree.

Our cases have long held that a police officer may briefly detain individuals to perform computer verifications on a driver's licence and examine insurance and registration documentation. See, e.g., United States v. Patten, 183 F.3d 1190, 1193 (10th Cir. 1999); United States v. Soto, 988 F.2d 1548, 1554 (10th Cir. 1993). Although those cases involved driver's licenses issued by states, we see no reason to carve out an exception for holders of foreign licenses. As Mr. Solorio informed the officer that he had been living in California for two years, it was entirely reasonable for the officer to determine whether a valid California license existed for Mr. Solorio.[1]

_____

[1]Because there is no dispute over the legality of the initial stop, we find Mr. Solorio's citation of United States v. Lopez-Soto, 205 F.3d 1101, 1105 (9th Cir. 2000), and United States v. Lopez-Valdez, 178 F.3d 282, 288-89 (5th Cir. 1999), unconvincing. Aplt. Br. at 11. Lopez-Soto and Lopez-Valdez held only that where an officer's basis for a stop proved to be an error of law, the stop was

Moreover, even assuming the five-minute detention exceeded the original scope of the stop, we have held that during the course of a traffic stop, further questioning and concomitant detention are permissible if the officer acquires an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity. United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998). Factors that contribute to the formulation of an objectively reasonable and articulable suspicion include having no proof of ownership of the vehicle, having no proof of authority to operate the vehicle, and inconsistent statements concerning one's travel itinerary. Id. (collecting cases).

We have held that "questions about travel plans are routine and may be asked as a matter of course without exceeding the proper scope of a traffic stop." See United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000) (quotation omitted). Moreover, inconsistencies regarding ownership or authority to operate a vehicle have figured prominently in our many cases upholding further questioning. See, e.g. United States v. Fernandez, 18 F.3d 874, 879-80 (10th Cir. 1994) (The "defining characteristic of our traffic stop jurisprudence is the defendant's lack of . . . some . . . indicia of proof to lawfully operate and possess the vehicle in question, thus giving rise to objectively reasonable suspicion.").

invalid. They do not address the validity of a detention while a police officer determines whether a foreign driver has an American license.

Here, Mr. Solorio provided vehicle documentation for a woman with a different last name. Mr. Solorio indicated that the car belonged to his girlfriend, but the registration indicated the car belonged to a married woman. Upon being asked about his travel agenda, Mr. Solorio first said that he had gone to Atlanta to visit someone for two days, but then changed his story to say that he had been there for a week. The officer further testified that Mr. Solorio became nervous. When evaluating these factors, we look at the totality of circumstances, and judge an officer's conduct in light of "common sense and ordinary human experience." United States v. McRae, 81 F.3d 1528, 1534 (10th Cir. 1996) (citations omitted). Additionally, we make our determination with deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances. Id. We hold, therefore, that the factors provided the officer with reasonable suspicion permitting him to detain Mr. Solorio and ask him whether he was carrying contraband and would consent to the search of the vehicle. Based upon the district court's factual findings of what occurred, we hold that the officer did not exceed the permissible scope of the stop, and the detention was not improper.

B. Sentencing

We review a district court's interpretation and application of the sentencing guidelines de novo, and its factual findings for clear error. United States v.

Swanson, 253 F.3d 1220, 1222 (10th Cir. 2001). We view evidence underlying a district court's sentence, and the inferences drawn therefrom, in the light most favorable to the district court's determination. United States v. Conley, 131 F.3d 1387, 1389 (10th Cir. 1997).

Under U.S.S.G. § 4B1.1, a defendant is a career offender if (1) he was at least eighteen years old at the time of the instant offense, (2) the instant offense of conviction is a felony that is either a "crime of violence" or a controlled substance offense, and (3) he has at least two prior felony convictions of either a "crime of violence" or a controlled substance offense.

A "crime of violence" is defined in U.S.S.G. § 4B1.2 as:

> any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or (2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

The district court established that Mr. Solorio had two prior felony convictions of either a crime of violence or a controlled substance offense, including a 1998 California conviction for vehicular manslaughter without gross negligence. The conviction was pursuant to Cal. Penal Code § 192(c)(3), which encompasses "driving a vehicle in violation of Section . . . 23152 or 23153 of the Vehicle Code and in the commission of a lawful act which might produce death, in an unlawful manner, but without gross negligence." Based on the facts

presented in court, Mr. Solorio was driving a vehicle while his blood contained 0.17 percent blood alcohol when he caused an accident resulting in the death of another. In determining that the manslaughter conviction at issue amounted to a crime of violence, the district court relied on the so-called "otherwise clause" of § 4B1.2, holding that the vehicular manslaughter "otherwise involves conduct that presents a serious potential risk of physical injury to another."

Mr. Solorio contends that the manslaughter statute under which he was convicted and the evidence presented to the district court of his prior conviction do not support a crime of violence finding. According to Mr. Solorio, this is so because in determining whether a prior offense constitutes a crime of violence, the first step is to look at "the statutory basis of conviction. If the statute is ambiguous, or broad enough to encompass both violent and nonviolent crimes, a court can look beyond the statutory count of conviction in order to resolve a patent ambiguity caused by a broad state statute." United States v. Farnsworth, 92 F.3d 1001, 1008 (10th Cir. 1996) (quotation omitted).

Mr. Solorio argues that the California vehicular manslaughter statute is ambiguous–requiring the district court to perform an extra-statutory examination–because the statute prohibits the unlawful killing of a human being when either § 23152 or 23153 is violated. Section 23153 provides that it is unlawful for a driver negligently to cause bodily injury to another while driving

under the influence of drugs or alcohol.  Cal. Veh. Code § 23153.  According to Mr. Solorio, because it is possible to be convicted of vehicular manslaughter for ordinary negligence, the statute is too broad to be categorically deemed a crime of violence.  Aplt. Br. at 17-18 (citing United States v. Gacnik, 50 F.3d 848, 856 (10th Cir. 1995); People v. Oyaas, 219 Cal. Rptr. 243, 246 (Cal. Ct. App. 1985)).

In Gacnik, we found Colorado's criminally negligent homicide statute to be ambiguous.  The statute in Gacnik criminalized causing the death of another through criminal negligence, defined as gross negligence.  We held that "[t]o label any and all conduct resulting in a charge of criminally negligent homicide as a 'crime of violence' . . . may sweep too broadly."  50 F.3d 856.

We find Gacnik inapposite.  Unlike the statute in Gacnik, Cal. Penal Code § 192 is not ambiguous because it "does not encompass all grossly negligent conduct that causes the death of another; rather, it criminalizes causing death by driving while under the influence of drugs or alcohol and with gross negligence." Farnsworth, 92 F.3d at 1009.  In Farnsworth, a case involving the same California vehicular manslaughter statute at issue here, we held that "the risk of injury from drunk driving is neither conjectural nor speculative. . . . Drunk driving is a reckless act that often results in injury, and the risks of driving while intoxicated are well known.  This is sufficient to satisfy the 'serious risk' standard of the 'otherwise' clause [of U.S.S.C. § 4B1.2(1)(ii)]."  Id. (quoting United States v.

- 13 -

Rutherford, 54 F.3d 370, 376-77 (7th Cir. 1995) (holding that vehicular assault by a drunk driver is a crime of violence)).

We also note that Application Note 1 of the commentary to U.S.S.G. Section 4B1.2 states that "crime of violence" includes "murder, manslaughter, kidnaping, aggravated assault, forcible sex offenses, robbery, arson, extortion, extortionate extension of credit, and burglary of a dwelling." (emphasis added). Because of our disposition of this case, however, we need not address the government's argument that since manslaughter is listed in the commentary, it is necessarily a crime of violence for sentencing purposes. Aplee. Br. at 13.

AFFIRMED.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge