UNITED STATES, Appellee

v.

Winchester ROBINSON, JR., Technical Sergeant
U.S. Air Force, Appellant

No. 02-0148

Crim. App. No. 33925

---

United States Court of Appeals for the Armed Forces

Argued November 13, 2002

Decided July 8, 2003

GIERKE, J., delivered the opinion of the Court, in which EFFRON,
J., joined. CRAWFORD, C.J., filed a separate opinion concurring
in the result. BAKER and ERDMANN, JJ., each filed a separate
dissenting opinion.

Counsel

For Appellant: Major Jefferson B. Brown (argued); Lieutenant
Colonel Beverly B. Knott and Major Jeffrey A. Vires (on
brief); Lieutenant Colonel Timothy W. Murphy and Major Terry
L. McElyea.

For Appellee: Captain Matthew J. Mulbarger (argued); Colonel
Anthony P. Dattilo, Lieutenant Colonel Lance B. Sigmon, and
Captain Christa S. Cothrel (on brief); Lieutenant Colonel
LeEllen Coacher.

Military Judge: Barbara G. Brand

**This opinion is subject to editorial correction before final publication.**

Judge GIERKE delivered the opinion of the Court.

A general court-martial convicted the Appellant, pursuant to his pleas, of failure to obey a lawful order, possessing cocaine, using cocaine, and assault, in violation of Articles 92, 112a, and 128, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 892, 912a, and 928, respectively.  Appellant's pleas of guilty to possession and use of cocaine were conditional pleas, entered in accordance with Rule for Courts-Martial 910(a)(2). The adjudged sentence, imposed by a panel of officer and enlisted members, provides for a bad-conduct discharge, confinement for six months, and reduction to pay grade E-4.  The convening authority approved the sentence but waived automatic forfeitures. The Court of Criminal Appeals affirmed the findings and sentence. United States v. Robinson, 56 M.J. 541 (A.F. Ct. Crim. App. 2001).

This Court granted review of the following issue:[1]

> WHETHER THE MILITARY JUDGE ERRED IN FAILING TO SUPPRESS ALL
> EVIDENCE OBTAINED AS THE RESULT OF AN UNLAWFUL STOP AND
> SUBSEQUENT SEARCH OF APPELLANT'S AUTOMOBILE.

For the reasons set out below, we affirm the decision of the Court of Criminal Appeals.

## Background

At the time of the offenses, the Appellant was assigned to the 45th Communications Squadron at Patrick Air Force Base (AFB),

---

[1] We heard oral argument in this case at the Washington & Lee University School of Law, Lexington, Virginia, on November 13, 2002, as part of "Project Outreach."  See United States v. Mahoney, ___ M.J. ___ n.1 (C.A.A.F. 2003).

Florida.  He was a Technical Sergeant (E-6) with approximately 19 years of active duty.

On the evening of February 27, 1999, Officer Mark Jennewein, a member of the Melbourne, Florida Police Department, was working the night shift on routine patrol.  Before joining the Melbourne Police Department, Officer Jannewein had been an Air Force security policeman for over five years.  His last military assignment was at Patrick AFB.  Melbourne is about six miles from Patrick AFB.

Officer Jennewein was patrolling a high-crime area, known for its drug and prostitution activity, in a marked police cruiser.  He was engaged in "a prostitution and drug interdiction."  At about 1:00 a.m., he noticed a maroon four-door Oldsmobile parked "right next to [a well-known drug dealer's] house in his dirt driveway or dirt lot."  His computer check of the license plate number revealed that the registered owner lived at 95-B Virginia.  Officer Jennewein saw a sticker on the vehicle that identified the registered owner as a noncommissioned officer assigned to Patrick AFB.  Officer Jennewein observed the car for another 10 or 15 minutes and then was called away for other duties.

Officer Jennewein continued his patrol and later parked his car behind a vacant liquor store in another high drug and prostitution area.  Shortly thereafter, he saw the same maroon Oldsmobile travelling on the roadway.  As soon as Officer Jennewein's marked police cruiser pulled out behind the Appellant's vehicle, the Appellant quickly made a right turn, without signaling, into an unpaved alley next to an apartment

3

complex.  The sudden turn did not cause Officer Jennewein to brake suddenly or swerve.  Officer Jennewein testified that failure to signal a turn is an indicator of impaired driving.  He decided to stop Appellant's vehicle when it made the sudden turn without signaling.  He activated his red and blue lights and made a traffic stop at approximately 1:30 a.m.

Officer Jennewein approached the Oldsmobile and asked the Appellant to produce his driver's license, vehicle registration, and proof of insurance.  Appellant fumbled with his wallet and was able to present his driver's license, but he was not able to find his registration and proof of insurance.  Officer Jennewein told him to keep looking for the other documents.

There was a passenger in the Appellant's car, who was "rough" looking, with tattered clothing, and somewhat emaciated, "like a street person."  The passenger had no identification, but said he lived in the neighborhood and that his name was Floyd Simmons.  Mr. Simmons said he knew the Appellant because they had worked together for the last six months as concrete block masons.  Officer Jennewein checked for outstanding warrants against Mr. Simmons, determined that there were none, and allowed him to leave.  Officer Jennewein asked the Appellant how he knew Mr. Simmons, and Appellant indicated they had just met.

After about 10 minutes, the Appellant found his registration and proof of insurance.  Meanwhile, Officer Duffy arrived in her patrol car as a backup, having heard Officer Jennewein report the traffic stop on the police radio.  Officer Jennewein noticed that the address on the Appellant's registration did not match the address on his driver's license.

Officer Jennewein requested a computer check for outstanding warrants against the Appellant. He was told to wait because of another request ahead of him. While waiting for a response, he began writing a ticket for failing to update the address on the driver's license. He gave Appellant a "verbal" warning for failing to signal his turn.

Officer Jennewein asked Appellant if he had any drugs or weapons in his car, and Appellant said he did not. Officer Jennewein then asked him to consent to a search of his vehicle. When Appellant declined, Officer Jennewein requested that a canine unit be sent to the scene.

Officer Jennewein asked Appellant about the military sticker on his vehicle, and Appellant responded that he was in the military. Officer Duffy asked Appellant for his military identification, and Appellant complied. Officer Jennewein then noticed that the date of birth on Appellant's military identification card was different from the date of birth on his driver's license. Appellant said that the Department of Motor Vehicles had made a mistake and would not allow him to correct it.

While conversing with Appellant, Officer Jennewein noticed an odor of alcohol coming from Appellant's person. Appellant's speech seemed somewhat "mumbled" and his eyes were watery and bloodshot.

Officer Jennewein was still writing the citation for the out-of-date address on the driver's license and still waiting for the computer check on Appellant when the canine unit arrived at approximately 1:48 a.m. Officer Jennewein asked Officer Gary

Markowski, the canine officer, to walk the canine around the car. When Officer Markowski asked Appellant to move back to avoid interfering with the canine, he noticed that Appellant "seemed to be a bit slow in his actions," and "seemed to be sluggish with his speech and his movements[.]"

Officer Jennewein advised Appellant that he suspected him of driving under the influence of alcohol, and he asked him to submit to a field sobriety exercise. Appellant refused. Meanwhile, the canine alerted on Appellant's vehicle. Officer Jennewein advised Appellant that he was being detained upon probable cause that he had a narcotic substance in his car. Appellant was handcuffed and placed in the patrol car.

Officers Jennewein and Markowski searched Appellant's vehicle and found rock cocaine and drug paraphernalia. Officer Jennewein then informed Appellant he was under arrest for possession of cocaine as well as driving under the influence of alcohol. Officer Jennewein testified that he would have arrested Appellant and searched his car even if the canine had not alerted.

At trial, Appellant moved to suppress "any and all evidence, including but not limited to cocaine, urine and blood tests and results, observations of the police officers, and military [identification] card obtained as the result of the unlawful seizure of the accused and resulting search of his vehicle[.]" The defense argued that there was no probable cause and "no justifiable or legal reasons for the stop" of Appellant's vehicle, because the turn without signaling did not violate Florida law. The defense further argued that the stop was

"unreasonably extended" to conduct a canine search of the vehicle.

Officer Jennewein did not specifically mention Florida law in his testimony. He referred to the failure to signal as an indicator of impaired driving and as a "traffic infraction." The only references to Florida law were in the defense's written motion to suppress and in oral argument on the motion.

The military judge made extensive findings of fact that comported with the uncontested testimony of Officers Jennewein and Markowski. Among these findings of fact, the military judge found, "Officer Jennewein initiated a traffic stop based upon the failure to properly signal." The military judge ruled that Officer Jennewein had probable cause to stop Appellant for a traffic violation when Appellant braked suddenly and turned without signaling; that, after making the traffic stop and observing Appellant, Officer Jennewein had a reasonable suspicion that Appellant was impaired; that the alert by the canine provided probable cause to search the vehicle; and that the cocaine and paraphernalia would have been inevitably discovered even if the dog had not alerted, because it would have been discovered during a search incident to arrest.

The military judge also ruled that the duration of the stop (approximately 21 minutes) was reasonable, based on the need to run two separate computer checks on Appellant and his passenger, the delay in receiving the second computer check because of heavy police activity, the inability of Appellant to promptly produce his registration and proof of insurance, and the prompt arrival of the canine unit while Officer Jennewein was still waiting for

7

the computer check and still writing the citation for the out-of-date address.

The military judge concluded that the Fourth Amendment was not violated; accordingly, she denied the motion to suppress.

The Court of Criminal Appeals did not disturb the military judge's findings of fact or make additional findings of fact. However, the court held that Officer Jennewein did not have probable cause to stop Appellant for a traffic violation, because Florida law requires a turn signal only when another vehicle is "affected" by the turn,[2] and Appellant's sudden turn without signaling did not affect Officer Jennewein by causing him to brake or swerve. However, the court concluded that the facts as found by the military judge were sufficient to establish reasonable suspicion sufficient to justify stopping Appellant's vehicle. Finally, the lower court concluded, as did the military judge, that the duration of the stop was reasonable.

---

[2] The statute provides:

> No person may turn a vehicle from a direct course upon a highway unless and until such movement can be made with reasonable safety, and then only after giving an appropriate signal in the manner hereinafter provided, in the event any other vehicle may be affected by the movement.

Fla. Stat. ch. 316.155 (2002)(emphasis added).

The Florida Supreme Court has held that § 316.155 is not violated by a failure to signal a turn if the turn did not affect any other vehicle. State v. Riley, 638 So.2d 507, 508 (Fla. 1994). The Florida Supreme Court's interpretation of state law is entitled to full faith and credit, "absent some prevailing federal interest properly proven." United States v. Allen, 27 M.J. 234, 239 (C.M.A. 1988).

Discussion

Appellant now asserts that Officer Jennewein stopped his vehicle under the erroneous belief that he had committed a traffic violation.  He also asserts that the facts were insufficient to justify an investigative stop, because there was not enough evidence to establish reasonable suspicion that he was involved in ongoing criminal activity.  Appellant has not challenged the duration of the stop.

The Government has not challenged the lower court's holding regarding Florida law.  Instead, the Government argues that the totality of the circumstances were sufficient to establish reasonable suspicion that Appellant was engaged in illegal activity.  Since the Government does not assert that there was probable cause for a traffic stop of the Appellant's vehicle, we limit our discussion to the question whether Officer Jennewein had reasonable suspicion that Appellant was engaged in criminal activity.

We review issues involving reasonable suspicion de novo. Ornelas v. United States, 517 U.S. 690, 699 (1996).  An investigative stop of an individual is permissible under the Fourth Amendment "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968).  Similarly, an investigative stop of a motor vehicle is constitutionally permissible where there is reasonable suspicion that the occupants are engaged in wrongdoing. United States v. Cortez, 449 U.S. 411, 418 (1981).  Based on the totality of the circumstances, "[T]he detaining officers must

have a particularized and objective basis for suspecting the particular person stopped of criminal activity." Id.

The concept of particularized suspicion has two elements. The first element is that "the assessment must be based upon all the circumstances." As the Supreme Court explained:

> The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions – inferences and deductions that might well elude an untrained person.

Id. This process of inferences and deductions "does not deal with hard certainties, but with probabilities." Id.

The second element of the particularized suspicion required is "that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing." Id. The factual basis for reasonable suspicion must be more than a mere "hunch." Terry, 392 U.S. at 27. However, it need not rise to the level of probable cause, and it falls considerably short of a preponderance of the evidence. United States v. Sokolow, 490 U.S. 1, 7 (1989).

In considering the totality of the circumstances, the detaining officer may consider a series of acts which are innocent in themselves, but which, taken together, warrant further investigation. United States v. Arvizu, 534 U.S. 266, 274-75 (2002). While mere presence in a high-crime area, standing alone, is insufficient for reasonable suspicion, it is a "relevant contextual consideration." Illinois v. Wardlaw, 528 U.S. 119, 124 (2000)(citing Adams v. Williams, 407 U.S. 143, 144, 147-48 (1972)). Unprovoked flight "is not necessarily indicative

of wrongdoing, but it is certainly suggestive of such." Id. Evasive behavior is a relevant consideration. United States v. Brignoni-Ponce, 422 U.S. 873, 885 (1975); United States v. Larios-Montes, 500 F.2d 941, 944 (9th Cir. 1974)(passengers in vehicle appeared to be trying to hide). The fact that a vehicle appears out of place is relevant. United States v. Gonzalez, 190 F.3d 668, 672 (5th Cir. 1999)(Border Patrol agents who were familiar with local traffic on isolated road did not recognize vehicle and noted it had out-of-state license plates). Finally, the time of day is relevant. Id.; United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993) (presence in known drug area at 1:00 a.m.); United States v. Knox, 950 F.2d 516, 519 (8th Cir. 1991)(presence in high-crime area late at night).

In this case, Appellant was twice seen by Officer Jennewein in high crime areas at an unusual time. The first time Appellant's vehicle was parked in "right next to" a well-known drug dealer's house. Appellant's vehicle, owned by an Air Force noncommissioned officer who lived on Patrick AFB, was out of place. Appellant's presence was sufficiently unusual that Officer Jennewein kept his vehicle under surveillance until he was called away by his dispatcher. A short time later, Officer Jennewein saw Appellant's vehicle a second time, cruising in a nearby high-crime neighborhood. As soon as Officer Jennewein pulled out behind Appellant's vehicle, Appellant made a sudden turn into an unpaved alley. Even if the turn was not illegal under Florida law, it was (1) evasive, (2) an indicator of impaired driving, and (3) unusual because it was a sudden turn onto an unpaved alley that was not a customary roadway.

11

Considering the totality of the circumstances, we hold that Officer Jennewein had reasonable suspicion sufficient to justify an investigative stop of the Appellant's vehicle.

When we review a military judge's ruling to admit or suppress evidence, we review the military judge's factfinding under the clearly-erroneous standard and conclusions of law de novo. United States v. Sullivan, 42 M.J. 360, 363 (C.A.A.F. 1995). There was no dispute regarding the predicate facts in this case. The only litigated issues at trial were Officer Jennewein's legal authority to stop the Appellant's car and the duration of the stop.

In this case, the military judge erroneously concluded that Officer Jennewein had probable cause to stop the Appellant for a traffic violation. However, the military judge's error was harmless, because the military judge reached the correct result, albeit for the wrong reason. We agree with the Court of Criminal Appeals that the facts found by the military judge were sufficient to establish reasonable suspicion for an investigative stop.

After making the investigative stop, Officer Jennewein quickly discovered evidence that Appellant had failed to update the address on his license and that he was driving while impaired. While Officer Jennewein was writing the citation for the driver's license violation, the canine alerted, giving him probable cause to search the vehicle. See United States v. Alexander, 34 M.J. 121, 125 (C.M.A. 1992)(canine's alert provided probable cause for search). Even before the dog alerted, Officer Jennewein had already decided that he had probable cause to

arrest Appellant for driving while impaired.  We hold that the military judge did not err by denying the motion to suppress the evidence obtained as a result of the investigative stop.[3]

## Decision

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

---

[3] In light of our holding that Officer Jennewein had reasonable suspicion to stop Appellant's vehicle, and that the canine's alert provided probable cause to search the vehicle, we need not decide whether the military judge correctly concluded that the evidence would have been inevitably discovered.

United States v. Robinson, No. 02-0148/AF

CRAWFORD, Chief Judge (concurring in the result):

The issue of whether the police officer had a reasonable suspicion that justified making an investigative stop of Appellant's motor vehicle is admittedly a close question in this case. Nevertheless, what is clear from the factors discussed and the analysis set forth by the majority is that the officer acted with a good faith belief that he had a legally justifiable reasonable suspicion to stop Appellant's motor vehicle. Therefore, I would apply the good faith exception to the exclusionary rule in this case and affirm Appellant's conviction.

This case presents the issue of whether the exclusionary rule should apply to evidence seized as a result of an investigative stop which the officer reasonably, but mistakenly, believed was a violation of Florida traffic law. The question of whether to invoke the good faith exception to a police officer's warrantless stop has divided state and federal courts. See, e.g., United States v. Ramirez-Lujan, 976 F.2d 930 (5th Cir. 1992); United States v. Williams, 622 F.2d 830, 840 (5th Cir. 1980); State v. Greer, 683 N.E.2d 82 (Ohio Ct. App. 1996); but see State v. Deherrera, 965 P.2d 501 (Utah Ct. App. 1998). The Military Rules of Evidence permit the admission of evidence derived from searches and seizures that otherwise satisfy the

United States Constitution. <u>See, e.g.</u>, Military Rules of Evidence 314(k), 316(f).

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

The amendment has two clauses -- the reasonableness clause and the warrant clause. It has no express provision for a remedy when evidence is obtained as a result of an illegal search or seizure. For more than 100 years after the American Revolution, the remedy for an illegal search or seizure was a trespass action for damages. In an early English decision, well known in this country, <u>Entick v. Carrington</u>, 19 Howell's State Trials 1029 (1765), the police ransacked Entick's home for four hours to obtain pamphlets that were highly critical of the king. Lord Camden, Lord Chief Justice of the Common Pleas, struck down the search warrant and awarded Entick 300 pounds in damages. He declared:

> This power so assumed by the secretary of state is an execution upon all the party's papers, in the first instance. His house is rifled; his most valuable secrets are taken out of his possession, before the paper for which he is charged is found to be criminal by any competent jurisdiction, and before he is convicted either of writing, publishing, or being concerned in the paper.

Id. at 1064.

The same Lord Camden invalidated the general warrants employed against John Wilkes, per the publication of Issue No. 45, The North Britons.  Wilkes v. Wood, 98 Eng. Rep. 484 (K.B. 1763).  Even the early courts in this country recognized that damages were the appropriate remedy.

> If the search warrant were illegal, or if the officer serving the warrant exceeded his authority, the party on whose complaint the warrant issued, or the officer, would be responsible for the wrong done; but this is no good reason for excluding the papers seized as evidence, if they were pertinent to the issue.

Commonwealth v. Dana, 43 Mass. (2 Met.) 329, 337 (1841).

The first move away from the remedy of damages was signaled in Boyd v. United States, 116 U.S. 616 (1886), in which the Court excluded documents obtained from Boyd's house because a "seizure of a man's private books and papers to be used in evidence against him is [not] substantially different from compelling him to be a witness against himself."  Id. at 633. Justice Bradley derived his conclusion in part from the following passage in Entick:

> It is very certain that the law obligeth no man to accuse himself; because the necessary means of compelling self-accusation, falling upon the innocent as well as the guilty, would be both cruel and unjust; and it should seem, that search for evidence is disallowed upon the same principle.  There too the innocent would be confounded with the guilty.

19 Howell's State Trials at 629.

The remedy the courts eventually formulated, the exclusionary rule for Fourth Amendment violations, was first enunciated in Weeks v. United States, 232 U.S. 383 (1914).  Even after Weeks, the state courts resisted the exclusionary rule.  Justice Cardozo questioned whether the "criminal is to go free because the constable has blundered."  People v. Defore, 150 N.E 585, 587 (N.Y. 1926).  He commented that although a number of states have applied Weeks, more have rejected it.  "With authority thus divided, it is only some overmastering consideration of principle or of policy that should move us to change.  The balance is not swayed until something more persuasive than uncertainty is added to the scales."  Id. at 588.

Nevertheless, in Mapp v. Ohio, 367 U.S. 643 (1961), the Court applied the exclusionary rule to the states.  In Mapp, the Court justified the exclusionary rule by placing emphasis on "the imperative of judicial integrity."  Id. at 659 (quoting Elkins v. United States, 364 U.S. 206, 222 (1960)).  The Court reasoned that the government had to play fair and could not be allowed to profit from illegal acts.  Justice Black believed that the self-incrimination clause of the Fifth Amendment

coupled with the Fourth Amendment justified the rule. Id. at 661-62 (Black, J., concurring).

The Court identified a second reason for the rule: to curb police misconduct effectively. As the Court stated, "the purpose of the exclusionary rule 'is to deter -- to compel respect for the constitutional guaranty in the only effectively available way -- by removing the incentive to disregard it.'" Mapp, 367 U.S. at 656 (quoting Elkins v. United States, 364 U.S. 206, 217 (1960)). The Court emphasized this purpose again in United States v. Calandra, 414 U.S. 338, 347 (1974), by stating that the exclusionary "rule's prime purpose is to deter future unlawful police misconduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures[.]"

In United States v. Leon, 468 U.S. 897 (1984), the Court applied the good faith exception to the exclusionary rule. Leon, a drug trafficker, was searched pursuant to a "facially valid" search warrant obtained by the state police. At trial, the evidence seized by the police was suppressed. The Court held that the good faith search or seizure by the police pursuant to a warrant does not require exclusion, even though probable cause was lacking. The Court commented that to the extent to which the exclusionary rule has no effect on the

behavior of magistrates as to the right to privacy, it is misplaced. "[T]he marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial cost of exclusion." Id. at 922. While exclusion is certainly warranted where there is a flagrant violation or a reckless disregard of the facts in a case, the deterrence rationale does not work when the officer is acting in good faith, as in this case.

In 1992, this Court adopted Leon in United States v. Lopez, 35 M.J. 35 (C.M.A. 1992). The Court recognized that the rationale in Leon "extends with equal force to search or seizure authorizations issued by commanders who are neutral and detached[.]" Id. at 39. In the past, the Courts of Military Review had been split on applying the good faith exception, id. at 40, and this Court had not clearly addressed the issue. We recognized that the good faith exception would not apply where there is intentional or reckless misconduct by the police, or where the basis for the action was totally lacking, and thus was unreasonable. Id. at 41-42. In this instance, there was not a flagrant disregard of the stop rule or unreasonable conduct.

With this background, I now turn to the question of whether and under what circumstances the good-faith exception to the

6

exclusionary rule can and should apply to a warrantless investigative stop by a police officer.

The defendant in Greer was seen by the police officer turning left into a cross-over area without using the left-turn lane provided and then went in the other direction. The officer stopped him for what appeared to be an illegal U-turn, but the Court, interpreting the state's statute, stated the officer's conclusion that it was an illegal U-turn may have been mistaken, yet the Court held that the stop was not unreasonable and applied the good-faith exception to a stop "based upon conduct observed by the officer that the officer mistakenly, but reasonably, believes to constitute a violation of law." 683 N.E.2d at 83. The stop in Greer was a "minor transgression," and not an intentional or flagrant illegality. Id. at 86.

The Fifth Circuit Court of Appeals has applied the good-faith exception to an investigatory stop in Ramirez-Lujon. Ramirez-Lujon was seen by a border patrol agent some 35 miles from the border, 25 miles east of El Paso, Texas, traveling on what was considered "a road to nowhere." 976 F.2d at 931. Drug smugglers were known to use this road to proceed to a known drug distribution center. A border patrol agent with three years' experience knew the locals who lived down that road. When he saw Ramirez-Lujon's pick-up truck, he did not recognize it as a

7

vehicle belonging to one of the ranchers who lived on the road and decided to investigate. After following the vehicle for some four miles, he decided to make a stop.

The court upheld the stop, based either on "the constitutional test of reasonableness or the good-faith exception." Id. at 933. The court held that "under all the circumstances, [the border patrol agent] acted with an objectively reasonable good faith belief that he had a reasonable articulable suspicion that legally justified stopping Ramirez[-Lujan]." Id. at 934. The court decided not to address the constitutionality of the stop because it "was sufficiently justified under the good-faith exception." Id. at 934 n.4.

The rationale in Greer and Ramirez-Lujon applies to this case. The majority holds that there was reasonable suspicion to stop Appellant.

> Appellant was twice seen by Officer Jennewein in high crime areas at an unusual time. The first time Appellant's vehicle was parked in "right next to" a well-known drug dealer's house. Appellant's vehicle, owned by an Air Force noncommissioned officer who lived on Patrick AFB, was out of place. Appellant's presence was sufficiently unusual that Officer Jennewein kept his vehicle under surveillance until he was called away by his dispatcher. A short time later, Officer Jennewein saw Appellant's vehicle a second time, cruising in a nearby high-crime neighborhood. As soon as Officer Jennewein pulled out behind Appellant's vehicle, Appellant made a sudden turn into an unpaved alley. Even if the turn was not illegal under Florida law, it was (1) evasive, (2) an indicator of impaired driving, and (3) unusual because

8

> it was a sudden turn onto an unpaved alley that was not a customary roadway. Considering the totality of the circumstances, we hold that Officer Jennewein had reasonable suspicion sufficient to justify an investigative stop of the Appellant's vehicle.

__ M.J. (11-12). Considering all the facts set forth by the majority, it is clear that Officer Jennewein had an objectively reasonable suspicion that Appellant was engaged in criminal activity. Certainly, there was more than one basis for the stop--the fact that one theory was precluded by the Florida statute does not preclude the application of the criminal misconduct theory under these facts.

Rejecting the exclusionary rule in this case would neither denigrate Fourth Amendment values nor complicate the right to privacy because this is not a question of police lawlessness. Certainly, deterrence of police misconduct is not necessary in a borderline case like this, where the officer has acted reasonably and in good faith. The courts have applied a reasonableness standard as to apparent authority, see Illinois v. Rodriguez, 497 U.S. 177 (1990)(third-party consent); Winters v. Adams, 254 F.3d 758 (8th Cir. 2001)(reasonable to detain agitated occupant of parked car who police suspected may be overdosing); Gallegos v. Colorado Springs, 114 F.3d 1024 (10th Cir. 1997)(reasonable to stop and check distraught person walking in the middle of the street), and many other exceptions

9

to the Fourth Amendment such that it would be incongruous not to apply it here.  California v. Acevedo, 500 U.S. 565, 580 (1991)(many reasonableness exceptions to the Fourth Amendment).

Whether the exclusionary rule is based on judicial integrity, see, e.g., Olmstead v. United States, 277 U.S. 438, 470, 484 (1928)(Holmes and Brandeis, JJ., dissenting), or the deterrence of police misconduct, Terry v. Ohio, 392 U.S. 1, 13 (1968), neither justification would require suppression in this case.

A "police officer will not be deterred from an illegal search if he does not know that it is illegal."  Charles Alan Wright, Must the Criminal Go Free if the Constable Blunders?, 50 Tex.L.Rev. 736, 740 (1972).  Because the officer's action in this case was reasonable, I would not apply the exclusionary rule and would affirm Appellant's conviction.

BAKER, Judge (dissenting):

I agree with the majority that an officer would have reasonable suspicion to justify an investigative stop of a vehicle where the totality of circumstances indicated that a vehicle had been parked briefly in the early morning hours in the driveway of a house known to be used for drug dealing, and that it was thereafter driven in a manner indicative of impaired driving.  However, because I do not believe the facts articulated on the record in this case support such a conclusion, I respectfully dissent.  In light of the factual deficiencies in this case, I need not address Judge Erdmann's fair concern regarding whether an appellate court could justify an investigatory stop on grounds of reasonable suspicion where the officer's articulated reason for the stop was a mistaken belief that Appellant had violated the law.

My analysis begins with United States v. Sokolow, 490 U.S. 1, 7 (1989), in which the Supreme Court expanded on Terry stating:

> In Terry v. Ohio, we held that the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity "may be afoot," even if the officer lacks probable cause.
> The officer, of course, must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.'"  The Fourth Amendment requires "some minimal level of objective justification" for making the stop.

1

Id. at 7 (citations omitted).  Thus, reasonable suspicion includes both subjective and objective components -- an officer's reasonable suspicion based on articulable facts objectively reviewed.[*]

In my view, the Fourth Amendment analysis in this case hinges on Officer Jennewein's articulation of two factual questions: where was Appellant's car parked and did Appellant drive his car in an impaired manner?

First, in what manner was Appellant's car "at" the house of a known drug dealer, IL?  Was it parked in the driveway, on the street specifically in a manner associated with IL's house or on the street as any other car might have been?  Officer Jennewein's testimony is not clear on this point.  Appellant's

---

[*]     This case is different from Whren v. United States, 517 U.S. 806 (1996).  In Whren, the issue was whether a court should look beyond an officer's articulated reasons for making an investigatory stop in determining whether reasonable suspicion existed for the stop.  Whren did not address the question posed here: whether an investigative stop can be upheld under the Fourth Amendment if an objective review of the record supported a finding of reasonable suspicion, despite the fact that the officer did not articulate those reasons as the basis for the stop and the articulated basis for the stop was unreasonable.

The Court of Criminal Appeals applied a purely objective standard of reasonableness in determining that Officer Jennewein had reasonable suspicion to stop Appellant, based on language in Whren indicating that "[s]ubjective intentions play no role in ordinary, probable cause Fourth Amendment analysis."  United States v. Robinson, 56 M.J. 541, 545 (A.F. Ct. Crim. App. 2001)(citing Whren, 517 U.S. at 813).  The court looked at all the facts available to Officer Jennewein and concluded that "a reasonable officer aware of these facts would have a lawful basis for a brief investigative stop." Id. at 548.  However, this approach mischaracterizes the holding of Whren. Whren did not alter the fundamental requirement that officers conducting investigative stops must articulate facts that support reasonable suspicion. If officers were not required to articulate some basis for the stop, courts would be left to "speculat[e] about the hypothetical reaction of a hypothetical constable," an approach rejected by the Supreme Court in Whren as unworkable.  Whren, 517 U.S. at 815.

car is characterized at various points in the record as "in front of," "at Steele [St.] and Mathers," "at [IL]'s," "over at [IL]'s," "at a house," and "right next to his house in his dirt driveway or dirt lot."  In an urban environment the factual distinction between parking on the street or in a driveway can reflect the difference between particularized suspicion and inchoate suspicion.  In the abstract, there is a significant difference between being parked in a "bad crime" driveway, and being parked in a "bad crime" neighborhood, which the Supreme Court has held, does not in itself provide reasonable suspicion to justify an investigative stop.  Illinois v. Wardlow, 528 U.S. 119, 124 (2000); Brown v. Texas, 443 U.S. 47, 52 (1979).  Nor did the Government move this testimony from the abstract to the specific by either reconciling the different testimonial statements regarding the location of Appellant's car or by showing with a map or photograph where Appellant's car was parked, thereby indicating how parking on the street necessarily connected Appellant's car with IL's house.  The Government also did not clarify this discrepancy at oral argument, despite persistent questioning from the judges.  Moreover, the record does not provide a sufficient factual basis to otherwise infer suspicion from street parking alone.

Second, did Appellant demonstrate indicia of impaired driving and did Officer Jennewein articulate suspected

3

impairment as a basis for stopping Appellant?  Here too, the
record is amorphous.  This may reflect the fact that the Fourth
Amendment search was argued at trial under the probable cause
rubric based on Appellant's (lawful) failure to signal.  On
appeal, the Government now finds itself arguing an alternative,
less developed, theory of reasonable suspicion.

On the one hand, impairment is certainly in the air at the
appellate level.  Officer Jennewein testified about his training
in identifying impaired drivers.  Officer Jennewein testified
that the failure to signal a turn and other kinds of conduct
such as "accelerating, decelerating, swerving in another lane of
traffic, wide turn, failure to signal, reckless driving, driving
without headlights, [and] erratic braking[,]" are factors
suggestive of impaired driving.  Officer Jennewein also
testified that he would not have followed Appellant's vehicle if
he had not previously seen the vehicle parked in some manner
adjacent to IL's house.

On the other hand, Officer Jennewein, never fully delivers
the punch line by expressly stating that he stopped Appellant's
car on account of his suspicion that the driver was impaired.
Moreover, on three separate occasions he testified that the sole
reason he stopped the vehicle was failure to properly use the
turn signal.  Such language does not preclude the possibility
that Officer Jennewein was motivated by a concern over impaired

4

driving--the failure to signal being merely the final indicator of impairment--but neither is it a clear articulation of reasonable suspicion of impairment as the predicate for Appellant's stop.

Significantly, the military judge found that the officer "initiated" his stop of the car because Appellant failed to signal properly. The military judge, having heard the testimony of the officer regarding his training, could have found suspected impairment as part of the officer's reasons for stopping Appellant's vehicle, but she chose not to make such a finding. For sure, the military judge may have omitted such a finding because she found it unnecessary given her conclusions that probable cause existed for violation of the statute. However, determining whether the military judge rejected the finding of impairment or simply found it unnecessary to reach would be appellate speculation.

In the absence of probable cause for failure to signal, the Government was left on appeal to stand on two factual legs of a reasonable suspicion ladder: the presence of Appellant's vehicle adjacent to a known drug dealer's house and indicia of impaired driving. Neither leg was clearly articulated in the record of trial. In my view, when the uncertainties in both legs are considered together, the record does not move from an inchoate to a particularized showing of suspicion required by the

5

<u>Terry</u>/<u>Sokolow</u> line of cases.  Something more particularized than the presence on a street with a house used for drug dealing and bad, but lawful driving, must be articulated to warrant an investigative stop.  The Government might have articulated additional relevant facts at trial if it had known its ultimate appellate posture, but that is not the record we have on appeal.

ERDMANN, Judge (dissenting):

I agree with the majority's initial finding that Officer Jennewein lacked probable cause to initiate a traffic stop of Appellant's car, based on his mistaken belief that a traffic violation had occurred. In affirming the Air Force Court of Criminal Appeals, however, the majority goes on to find that the detaining officer had reasonable suspicion to justify an investigatory stop of Appellant's vehicle, i.e., "reasonable suspicion" that the occupants were engaged in wrongdoing. I dissent from both the analysis utilized by the majority and from the finding that the facts known to the officer at the time of the stop rose to the level of reasonable suspicion. I would reverse the Air Force Court of Criminal Appeals.

The initial traffic stop in this case was made by Officer Jennewein solely because Appellant failed to signal when he turned his car into an alley. After the stop a canine unit called by Officer Jennewein alerted on the car and following a consensual search, cocaine was discovered. Appellant was subsequently charged with possession and use of cocaine, amongst other charges. At a proceeding pursuant to Article 39, Uniform Code of Military Justice, 10 U.S.C. § 839 (2000), Appellant contested the admission of the seized evidence, arguing that the initial stop was in violation of the Fourth Amendment. The military judge found no Fourth Amendment violation, ruling that

1

Officer Jennewein had probable cause to stop Appellant for a traffic violation.  Appellant subsequently entered a conditional plea of guilty to the possession and use of cocaine specifications.

The Air Force Court of Criminal Appeals found that under Florida law there was no probable cause to believe that a traffic violation had occurred, which rendered the stop in violation of the Fourth Amendment.  The lower court rejected, however, Appellant's argument that the evidence derived from the stop must be suppressed.  Seeking an alternative basis to uphold the initial stop under the Fourth Amendment, the Air Force court went on to "determine whether there is some other basis in the law for the stop and the resulting searches that led to the evidence of the use and possession of cocaine."  United States v. Robinson, 56 M.J. 541, 544  (A.F. Ct. Crim. App. 2001).  A divided Air Force Court found that, despite the initial illegal stop based on the traffic violation, the stop was reasonable under the circumstances and the evidence was admissible.

Because Officer Jennewein testified that he made the stop based only on the suspected traffic violation, the Air Force Court adopted an analysis that allowed them to move beyond the officer's stated reason for the stop and determine whether a "reasonable officer" would have had "reasonable suspicion" for the stop.  The lower court relied on Whren v. United States, 517

U.S. 806 (1996), for the proposition that the subjective intentions of the detaining officer are irrelevant to a Fourth Amendment analysis. In my view, Whren is inapposite and provides no basis for seeking an alternate finding of reasonableness after an invalid or unlawful traffic stop. The majority opinion suffers this same delict: there is no transitional analysis supporting an appellate court's authority to search for some other basis to uphold the stop after determining that the only articulated, record basis for the stop was unlawful.

As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.[1] Whren, 517 U.S. at 810. It is important to note that the Court in Whren was dealing with a case where the legality of the initial stop was not in question and in fact was not even challenged on appeal. In Whren District of Columbia police became suspicious of the defendant's car due to its temporary license plates, youthful occupants and the fact that the driver remained stopped at an intersection for what seemed to be an unusually long time while looking down into

---

[1] The cases in this area reference both the "probable cause" standard and "reasonable suspicion" standard. In this context the "probable cause" standard is applied when the officer has reason to believe that an offense has occurred while the "reasonable suspicion" standard is generally applied when the officer believes that criminal activity "may be afoot."

the lap of the passenger.[2]  The police then observed the car turn suddenly without signaling and drive off at an "unreasonable" speed, activity that constituted valid traffic violations.  The police executed a stop based on the traffic violations and observed two large plastic sacks of crack cocaine in Whren's hands.

The defendants argued that the police did not have probable cause or even reasonable suspicion to believe that they were engaged in an illegal drug activity and that the officer's asserted ground for the stop – to give the driver a warning concerning the traffic violations – was pretextual.[3]  The Supreme Court found that the subjective intent of the officers does not play a role in an ordinary probable cause Fourth Amendment analysis.  The Sixth Circuit later described Whren as holding that "an officer may stop a vehicle for a traffic violation when his true motivation is to search for contraband, as long as the

---

[2] It is difficult to conclude that these facts, standing alone, would rise to the level of "reasonable suspicion" that criminal activity is afoot.

[3] On appeal the defendants did not dispute that the traffic violations constituted probable cause to support the stop. Rather, they argued that, "in the unique context of civil traffic regulations," probable cause was not enough.  United States v. Whren, 517 U.S. 806, 810 (1996).  Specifically they argued that a higher standard was required to deter the pretextual use of traffic stops as a means of investigating other violations of the law as to which no probable cause or even articulable suspicion exists.  Id.

officer had probable cause to initially stop the vehicle." United States v. Hill, 195 F.3d 258, 264 (6th Cir. 1999), cert. denied, 528 U.S. 1176 (2000).

The Supreme Court in Whren quoted Scott v. United States, 436 U.S. 128 (1978), for the principle that "subjective intent alone . . . does not make otherwise lawful conduct illegal or unconstitutional."  517 U.S. at 813  (emphasis added).  Whren simply stands for the principle that an officer may legally stop a vehicle after observing suspicious behavior that does not rise to the level of "reasonable suspicion," as long as there is probable cause to believe there has been a traffic violation.

If failing to signal a turn under the circumstances presented in this case had in fact been a valid traffic violation in Florida,[4] then the fact that the officer's real motivation for the stop may have been suspicion of drug activity would not have invalidated the seizure or subsequent search as the officer would have had probable cause to make the traffic stop.  Those, however, are not the facts of this case.  There is no dispute that Florida law does not prohibit a turn without signaling under the circumstances found here and that Officer Jennewein made the stop based on a mistake of law.

---

[4] There is no evidence in this case that Officer Jennewein made the stop based upon a suspicion of illegal drug activity.  He testified conclusively that the only reason for the stop was the traffic violation.

In United States v. Miller, 146 F.3d 274 (5th Cir. 1998), police stopped the defendant after he drove his motor home through an intersection with his turn signal on, without changing lanes or turning. The police found marijuana in the motor home as the result of a subsequent consensual search, but it was later determined that flashing a turn signal without turning or changing lanes was not a violation of Texas law. In finding that the evidence was not admissible, the Fifth Circuit stated:

> The rule articulated by the Supreme Court in Whren provides law enforcement officers broad leeway to conduct searches and seizures regardless of whether their subjective intent corresponds to the legal justifications for their actions. But the flip side of that leeway is that the legal justification must be objectively grounded. See Whren, 116 S.Ct. at 1774; see also Goodwin v. Johnson, 132 F.3d 162, 173 (5th Cir. 1998)("So long as a traffic law infraction that would have objectively justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment." (emphasis added)). Here, given that having a turn signal on is not a violation of Texas law, no objective basis for probable cause justified the stop of Miller.

146 F.3d at 279 (footnote omitted).

In United States v. Lopez-Valdez, 178 F.3d 282 (5th Cir. 1999), the Fifth Circuit again addressed this area where an officer mistakenly stopped a car for an improper taillight. Although the officer thought in good faith that the broken taillight constituted a traffic infraction the court held that

6

there was no probable cause for the stop.  The government argued

that the drugs seized as a result of the stop should be admitted

under the good-faith exception to the exclusionary rule, but the

Court disagreed:

> Under the general rule established in Whren, a traffic
> infraction can justify a stop even where the police officer
> made the stop for a reason other than the occurrence of the
> traffic infraction.  See Goodwin v. Johnson, 132 F.3d 162,
> 173 (5th Cir. 1998).  But if officers are allowed to stop
> vehicles based upon their subjective belief that traffic
> laws have been violated even where no such violation has,
> in fact, occurred, the potential for abuse of traffic
> infractions as pretext for effecting stops seems boundless
> and the costs to privacy rights excessive.  Accordingly, we
> hold that [the officer's] actions do not pass muster under
> the good-faith exception to the exclusionary rule.

178 F.3d at 289.

In United States v. Mariscal, 285 F.3d 1127 (9th Cir.

2002), a case remarkably similar to the underlying facts of this

case, police were conducting an undercover surveillance of a

residence and a vehicle parked at the residence.  They observed

the car pull away from the house and make a right turn without

using mechanical or hand signals.  A traffic stop was made based

on the failure to signal a turn.  A subsequent search of the car

revealed a concealed weapon and one of the occupants admitted

that the gun was his and that he was in the country illegally.

Relying on a long line of Ninth Circuit authority, the court

stated:

> If an officer simply does not know the law, and makes a
> stop based upon objective facts that cannot constitute a

violation, his suspicions cannot be reasonable. The chimera created by his imaginings cannot be used against the driver. So, when an officer thought that a Baja California vehicle registration statement had to be visible from the rear, whereas the Baja California law required that it be on the upper right corner of the windshield, the officer's mistaken belief could not "justify the stop under the Fourth Amendment." Lopez-Soto, 205 F.3d at 1106. Similarly, when an officer thought that Michigan required cars to have two license plates, but it indeed only required one, a stop based on the two-plate theory was not based on reasonable suspicion. Twilley, 222 F.3d at 1096. Simply put:

> A suspicion based on such a mistaken view of the law cannot be the reasonable suspicion required for the Fourth Amendment, because "the legal justification [for a traffic stop] must be objectively grounded." In other words, if an officer makes a traffic stop based on a mistake of law, the stop violates the Fourth Amendment.

> Id. (citations omitted); see also United States v. King, 244 F.3d 736, 741-42 (9th Cir. 2001)(a mistaken belief that a driver's conduct violated the law could not support a reasonable suspicion that a crime had been committed, even if the officer otherwise behaved reasonably).

285 F.3d at 1130.

While it is clear under Whren that evidence seized as the result of a pretextual, although otherwise legal, traffic stop is admissible, the issue here is whether Whren provides authority for an appellate court to uphold admitting evidence seized subsequent to an illegal traffic stop on the basis that the stop was a lawful investigative stop based on reasonable suspicion. Clearly it does not. The general rule is that if an initial stop violates the Fourth Amendment, the evidence seized

8

as a result of the stop is subject to suppression.  United States v. Childs, 256 F.3d 559 (7th Cir. 2001).

Although the majority opinion does not provide the legal basis for their analytical transition from the initial illegal stop to the "reasonable suspicion" review, the danger in both its approach and that of the Air Force Court is that an officer can use an illegal traffic stop with impunity as long as an alternative theory for admissibility of the evidence can later be developed.  As noted in Lopez-Valdez, 178 F.3d at 289, if a subjective but mistaken belief that a traffic violation has occurred is all that is required, "the potential for abuse of traffic infractions as pretext for effecting stops seems boundless and the costs to privacy rights excessive."  Further, once the illegal traffic stop is made there is a natural tendency to utilize the events and evidence discovered after the stop to justify the initial stop, as evidenced by the extent to which those facts are exhaustively discussed the decisions of both Court of Criminal Appeals and the majority opinion.

There is something troubling about a concept where the initial police action violates the Fourth Amendment but an appellate court later develops a theory which allows the admission of the evidence.  In upholding the admission of evidence seized subsequent to an illegal traffic stop on the basis that the stop was a lawful investigative stop based on

9

reasonable suspicion, the majority extends that concept further than any reported court decision.  I would hold that under the Fourth Amendment the admission of the evidence is not allowable and would reverse the court below on that basis.

However, even if the traditional analysis were applicable to this situation, I would find a lack of "reasonable suspicion."  Absent a warrant or probable cause to believe that an occupant has committed or is committing a crime, including a traffic violation, a law enforcement officer may lawfully stop a vehicle when the officer has a reasonable, articulable suspicion that criminal activity is afoot involving the vehicle.  An "officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." Illinois v. Wardlow, 528 U.S. 119, 123-24 (2000)(quoting Terry v. Ohio, 392 U.S. 1, 27 (1968)(internal quotation marks omitted)).

The majority sets forth three grounds in support of their finding of "reasonable suspicion:"

> Appellant was twice seen by Officer Jennewein in high crime areas at an unusual time.

Actually, Appellant was not seen twice by Officer Jennewein.  The officer initially noticed a parked maroon four-door Oldsmobile that was registered to the Appellant.  However, he did not see the Appellant or anyone else in the car and he

had no idea who was driving the car. The record is unclear as to where the car was parked, other than the fact that it was parked in the vicinity of a "known crack-house."

At the Article 39(a) hearing, Officer Jennewein testified inconsistently as to exactly where the car was parked – and this is a critical element for the Government to establish in the "reasonable suspicion" analysis. If the car was legally parked on a public street, then it would be less suspicious than if it were parked "next to" or "in the driveway" of a known crack house. On two occasions Officer Jennewein testified that the car was parked "in front" of the house and three times he simply stated the vehicle was "at" the house. On a single occasion he testified that the car was parked "right next" to the house in the "dirt driveway or dirt lot." There is no reason to believe that Officer Jennewein's single assertion that the car was parked next to the house is any more believable than his multiple assertions that it was parked in front of or at the house. The Air Force court found only that the car was "parked outside the home." Robinson, 56 M.J. at 547. The parties stipulated later as part of the conditional plea that Appellant's car was "parked on Steele Street."

The second time Officer Jennewein observed the car, Appellant was driving down the public street in a legal manner.

The officer had not seen Appellant in the "known crack house" nor had he seen him with any known criminals or drug dealers.

Appellant's vehicle, owned by an Air Force noncommissioned officer who lived on Patrick AFB, was out of place.

The fact that a vehicle or individual is located in a high crime area is not, in itself, evidence of illegal conduct.[5] Further, the fact that the vehicle was registered to an Air Force noncommissioned officer adds little to a "reasonable suspicion" analysis. Officer Jennewein's testimony that "it's not a kosher place for a [military] member or a family member to be" leads to the conclusion that it may be a kosher place for an individual who is not a member of the military. Military members come from all socio-economic backgrounds and may well have valid reasons to visit family and friends in what are characterized as "high crime areas." It is completely inappropriate to categorize military members as a "class" deserving higher attention or suspicion from the police.

As soon as Officer Jennewein pulled out behind the Appellant's vehicle, the Appellant made a sudden turn into an unpaved alley. Even if the turn was not illegal under Florida law, it was (1) evasive, (2) an indicator of impaired driving, and (3) unusual because it was a sudden turn onto an unpaved alley that was not a customary roadway.

---

[5] Brown v. Texas, 443 U.S. 47, 52 (1979); United States v. Basey, 816 F.2d 980, 989 (5th Cir. 1987); United States v. Davis, 94 F.3d 1465, 1470 (10th Cir. 1996); United States v. Sprinkle, 106 F.3d 613, 618 (4th Cir. 1997); United States v. Green, 111 F.3d 515, 520 (7th Cir. 1997), cert. denied, 522 U.S. 973 (1997).

Officer Jennewein testified that once he saw the four-door maroon Oldsmobile drive by he "pulled out and as soon as [he] pulled out, [he] got right behind it and the individual pulled into an alley which is between Guava and Avocado [Streets] and he failed to signal." Officer Jennewein clarified, however, that the distance between his vehicle and Appellant's was 150 feet. While Officer Jennewein initially stated that the Appellant "slammed on" his brakes when he pulled his police cruiser into the street, he corrected himself and testified that the Appellant "decelerated and stepped on the brake pedal and abruptly turned right into the alleyway." The Air Force court determined only that "within two or three seconds that [A]ppellant quickly turned off the roadway, without signaling." Robinson, 56 M.J. at 548. While certain conduct that constitutes flight or avoidance of police is suggestive of wrongdoing,[6] individuals driving in a normal, lawful manner have not been considered to be evasive.[7] At no time did Officer Jennewein testify that Appellant tried to evade him, speed away, or do anything other than turn suddenly into an alley and then

---

[6] United States v. Raibley, 243 F.3d 1069 (7th Cir. 2001); United States v. Elkins, 70 F.3d 81 (10th Cir. 1995); Commonwealth v. Grandison, 741 N.E.2d 25 (Mass. 2001); State v. Vadnais, 677 A.2d 155 (N.H. 1996).

[7] Sprinkle, 106 F.3d at 617-18; State v. Haviland, 532 N.W.2d 767 (Iowa 1995).

stop after the officer turned his emergency lights on.

Impaired driving is simply not a reasonable conclusion to be drawn from these facts. Absent an underlying traffic offense, the mere failure to use a turn signal is not indicative of criminal activity being afoot, including impaired driving. Where the law does not mandate the use of the turn signal in the first place, the wholly lawful act of turning without using the signal bears no reasonable relationship to a lapse of judgment indicative of impaired driving. The record makes clear that Officer Jennewein did not perceive impairment as a basis for his actions at the time this stop was actually made and it was not found as a basis for the stop by the military judge or the Court of Criminal Appeals.

The majority engages in speculation when it states that the alley into which Appellant turned was not "customarily" used as a roadway. This alley was not a short dead-end; it was a through alley connecting two streets in the area of an apartment building. According to Officer Jennewein, the alley "was used by all the residents." A reasonable, if not the sole, purpose of this alley is vehicular traffic.[8]

---

[8] Interestingly, after the stop Officer Jennewein discovered that the passenger in Appellant's car lived "right there on Avacado [Street]." To an experienced officer familiar with the area, a turn at this point to drop off a passenger or visit a resident of the apartment building would be usual and "customary."

United States v. Robinson, 02-0148/AF

"Reasonable Suspicion"

"Reasonable suspicion" is "a particularized and objective basis" for suspecting the person stopped of criminal activity. Ornelas-Ledesma v. United States, 517 U.S. 690, 696 (1996). "Reasonable suspicion" is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity. United States v. Twilley 222 F.3d 1092, 1096 (9th Cir. 2000).

The pre-stop specific, articulable facts in this case simply do not constitute "reasonable suspicion." Although recognizing that a Fourth Amendment analysis of reasonable suspicion is objective and viewed through the eyes of the reasonable officer, the Supreme Court has also held that reviewing courts should look to the specialized training and experience of the detaining officer to make inferences that might elude an untrained person.[9] This analysis cuts both ways, and here it is important to note that none of the reasons cited by the majority rose to a level that Officer Jennewein, with his specialized training and experience, considered sufficient to rely upon as a basis for a "reasonable suspicion" stop. Rather, Officer Jennewein testified repeatedly that the only basis for

---

[9] United States v. Arvizu, 534 U.S. 266, 273 (2002).

the stop was his belief that a traffic violation had occurred. The majority is then left with the difficult task of constructing a basis for "reasonable suspicion" where the detaining officer articulated the grounds relied upon by the majority and found them lacking.

The weight of evidence in the record indicates that Appellant's car was legally parked on a public street in a high crime area. Appellant was not seen in the area of the crack house, nor was he seen going into or out of the house. The presence of his car in this location does not create a nexus between him and criminal drug activity. While Appellant's military status seemed to have struck a chord with Officer Jennewein, from an objective standpoint it does not create or increase the level of suspicion. Assuming that it was unusual for a car to be parked in that area, then it should be no more unusual if the car is owned by a military member or by a civilian.

The fact that Officer Jennewein later saw the car driving down the street does not add any additional cause for suspicion. The car had been earlier seen parked in the area and it is logical that at some point it would be driven to another location. Under these circumstances the legal movement of a vehicle on a public street does not provide any additional basis for "reasonable suspicion." Finally, Appellant made a legal

16

turn into an alley. While Officer Jennewein and the majority characterize the turn as "sudden," Appellant didn't slam on his brakes, drive in an erratic fashion or do anything else that would bring attention to him – other than failing to turn on his turn signal. In fact, in a matter of three to four seconds, Officer Jennewein covered the 150 foot distance between his vehicle and Appellant's, and followed Appellant through the turn before effecting the stop.

Under the rationale adopted by the majority the following facts would constitute "reasonable suspicion" that the car was involved in illegal drug activity or that the driver was impaired: a car owned by military member was seen parked in a high crime area late at night in the vicinity of a known crack house; the car was later seen driving down a public street and turning into an alley in a sudden but legal manner.

## Conclusion

The initial stop for a traffic offense was invalid and violated the Fourth Amendment. I would hold the evidence should have been suppressed and reverse the Air Force Court of Criminal Appeals on that basis. Even if I engaged in a traditional reasonable suspicion analysis, unembellished by what transpired

after the illegal stop, these facts do not rise to the level of "reasonable suspicion" and the evidence should have been suppressed.